**UNITED STATES FIDELITY AND GUARANTY COMPANY, a foreign insurance company, Plaintiff,**

v.

**THOMAS SOLVENT COMPANY; a Michigan corporation, et al., Defendants.**

**Catherine ALLEN, Individually, and as Next Friend of Eric Allen, Troy Allen and Richard Allen, Minors et al., Intervening Plaintiffs.**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY, Intervening Defendant/Cross–Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, a foreign insurance company, et al., Cross Defendants.**

**GRAND TRUNK WESTERN RAILROAD COMPANY, Intervening Defendant/Counter Plaintiff,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a foreign insurance company, Counter Defendant.**

No. K85–415.

United States District Court,
W.D. Michigan.

Jan. 8, 1988.

On Motion for Reconsideration,
March 17, 1988.

On Motion for Reclarification,
April 14, 1988.

Miller, Canfield, Paddock & Stone by Michael B. Ortega, Kalamazoo, Mich., by Charles E. Ritter, for U.S. Fidelity and Guar. Co.

Smith, Haughey, Rice & Roegge by John M. Kruis, Grand Rapids, Mich., for Guaranty Nat. Ins. Co.

Rhoades, McKee & Boer by F. William McKee and Michael T. Small, Grand Rapids, Mich., for Hartford Acc. & Indemnity.

Nelson and Krueger by James R. Nelson, Grand Rapids, Mich., for Admiral Ins. Co.

Kitch, Saurbier, Drutchas, Wagner & Kenney by Gregory G. Drutchas, Detroit, Mich., by Stephen M. Kelley, for St. Paul Fire & Marine.

Piatt, Bartosiewicz & Tiderington by Gary P. Bartosiewicz, Kalamozoo, Mich., for Auto-Owners Ins. Co.

Ryan, Jamison & Hubbell by Daniel K. Jamieson, Kalamazoo, Mich., for Integrity Ins. Co.

Bremer, Wade, Nelson & Alt by Michael D. Wade, Grand Rapids, Mich., for Great American Surplus.

Cholette, Perkins & Buchanan by William D. Buchanan, Grand Rapids, Mich. by Kenneth L. Block, Pretzel & Stouffer, Chartered by Samuel B. Isaacson, Chicago, Ill., for Gibralter Cas. Co. (Co-Counsel).

Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald by William J. Ewald, Ronald G. Musto, Grand Rapids, Mich., for Northstar Re-Insurance Co.

Early, Lennon, Peters & Crocker by J. Richardson Johnson, Kalamazoo, Mich., for First State Ins. Co.

Sullivan, Hamilton & Schultz by Robert P. Hamilton and James M. Sullivan, Battle Creek, Mich., for Thomas Solvent Co. and Thermo–Chem, Inc.

Gemrich, Moser, Domrowski, Bowser & Fette by William L. Fette, Kalamazoo, Mich., for applicants for intervention.

Tolley, Fisher & Verwys, P.C. by Peter R. Tolley, Grand Rapids, Mich., for Northbrook Excess and Surplus Ins. Co.

Lilly, Domeny, Durant, Byrne & Schanz, P.C., by Terrence J. Lilly, Kalamazoo, Mich., for Canadian Universal Ins. Co.

Straub, Seaman & Allen, P.C. by Drew F. Seaman, St. Joseph, Mich., for Continental Cas. Co.

Bodman, Longley & Dahling by Fredrick J. Dindoffer, R. Craig Hupp, Detroit, Mich., for Grand Trunk Western R. Co. (proposed intervener).

Law Offices of Joseph William Moch by Joseph William Moch, Grand Rapids, Mich. by Terry E. Heiss, for intervening plaintiffs.

Allen, Lippes and Shonn by Richard Lippes, Buffalo, N.Y., Brown & Transeth by James B. Brown, Lansing, Mich., for Adkins Group.

Landman, Latimer, Clink & Robb by Steven C. Kohl, Muskegon, Mich., for Thermo Chem Participating Co.

## OPINION

ENSLEN, District Judge.

On September 11, 1987, I filed an opinion and order granting plaintiff USF & G's motion for clarification and reconsideration. The September 11th opinion essentially returned this case to the *status quo* prior to August 7, 1987. *See* Opinion filed September 11, 1987 in K85–415.

Presently before me is that portion of USF & G's motion for summary judgment filed March 5, 1987 which seeks a declaratory judgment with respect to the duty to defend issue as to the "General Liability Policy Issuers"[1] and the "Automobile Policy Insurers."[2] USF & G originally moved for a declaratory judgment only as to defendants Canadian, Northbrook, St. Paul and Hartford. I note that pursuant to the stipulation entered into between USF & G and Continental filed May 8, 1987, Continental is now included in that list. The remainder of the defendants in the declaratory judgment action are "excess" or similarly described carriers whose policies of insurance do not contain a primary duty to defend provision although some of the excess policies may contain duty to defend provisions which are activated only after underlying limits have been exhausted.[3] *See* USF & G's Motion for Summary Judgment at 4, n. 2. The parties have agreed that at this time a determination of their duty to indemnify is premature. Pursuant to my Order of August 18, 1987 and the discussion between Magistrate Rowland and counsel during the hearing of August 15, 1986, the parties agreed that I should rule upon the duty to defend issue before entertaining motions concerning the duty to indemnify.

Plaintiff USF & G issued Comprehensive General Liability ("CGL") and Comprehen-

1. Defendants Continental Casualty Company ("Continental"), Canadian Universal Insurance Company ("Canadian"), Northbrook Excess and Surplus Insurance Company ("Northbrook"). St. Paul Fire & Marine Insurance Company ("St. Paul") and Ideal Mutual Insurance Companies ("Ideal"), as well as plaintiff United States Fidelity and Guaranty Company ("USF & G") are all considered and collectively referred to as "General Liability Policy Issuers." The Court notes that Ideal has failed to appear and respond in this action.

2. Defendants Hartford Accident and Indemnity Company ("Hartford"), Continental Casualty Co.

("Continental") as well as plaintiff United States Fidelity and Guaranty Company ("USF & G") are all considered and collectively referred to as "Automobile Policy Issuers."

3. Defendants Auto–Owners Insurance Company ("Auto–Owners"), Great American Surplus Lines Insurance Company ("Great American"), Admiral Insurance Company ("Admiral"). First State Insurance Company ("First State"), Guarantee National Insurance Company ("National"), Gibralter Casualty Company ("Gibralter") and Integrity Insurance Company ("Integrity") are all considered and collectively referred to as "Excess Policy Issuers."

sive Automobile Liability policies covering November 1, 1968 to November 17, 1978 when the last policy was cancelled. USF & G believes that the November 17th cancellation was later made effective as of November 1, 1978—the date on which other insurance apparently obtained by Thomas Solvent became effective. *See* USF & G's Brief in Support of Motion for Partial Summary Judgment at 5. USF & G further asserts that it has no policies or declarations pages for any policies before November 1, 1975. Apparently USF & G's named insureds at all times included the Thomas Solvent Company and Thermo–Chem, Inc., and included Thomas Transportation Co., Fred E. Thomas, Letha D. Thomas and Thomas Development Corp. for various periods of time.

Canadian issued General Liability policies to Thomas Solvent Company and Thermo–Chem, Inc., covering November 1, 1978 to November 1, 1981.

Northbrook covered Thomas Solvent Company, Thomas Development Corp. and Thermo–Chem, Inc., for CGL insurance under two policies covering November 1, 1981 through November 1, 1983. Several more Thomas Solvent entities, including T.S.C. Transportation, Inc., were added in 1982, via endorsements.

St. Paul's CGL insurance policy was issued to cover November 1, 1983 to November 1, 1984, but St. Paul alleges that it was effectively cancelled March 19, 1984. St. Paul's named insureds include seven of the Thomas Solvent entities, including Thomas Solvent Co., Thomas Development Co., and Thermo–Chem, Inc.

Hartford issued a Commercial Automobile policy for November 1, 1981 to November 1, 1984, covering Thomas Solvent and Thermo–Chem, Inc. Apparently, it also issued one or more earlier Commercial Auto policies, the last of which expired on November 1, 1981. The latter policy, however, was apparently destroyed and is no longer available. Hartford also issued a Business Auto policy for November 1, 1984 to November 1, 1985. That policy named additional insureds, including T.S.C. Transportation, Inc. *See*, in general, Defend-

ants' Answers to USF & G's interrogatories, attached to USF & G's Brief in Support as Exs. "B," "C," "D," and "E." (The policy allegedly issued by Continental is the so-called "phantom" policy. The Court will address that matter in due course in a separate discussion.)

*Facts*

In order to place this motion in its proper context, it is necessary to briefly identify the major parties and to describe, in general terms, the underlying substantive claims brought by and against those parties. Thomas Solvent Company is a Michigan corporation which was originally founded in the 1930s by Fred Thomas who operated the business as a sole proprietorship until it was incorporated on February 7, 1963. Thomas Solvent Company was engaged in the sale and distribution of industrial solvents and operated from two principal locations during the times relevant to this and other pending litigation.

The principal place of business was located at 1180 North Raymond Road, Battle Creek, Michigan (hereinafter "Raymond Road Site"). The other site was located approximately ¼ mile away ("The Annex"). The Annex included railroad siding facilities, one above-ground storage tank and one below-ground storage tank. Railroad cars containing solvent products were unloaded at the Annex and were stored and/or distributed in motor vehicle tankers or barrel containers. Underground tanks which were connected to an underground distribution system were situated at the Raymond Road Site. Industrial solvents were delivered to these latter facilities. The solvents were then extracted from the tanks and distributed by motor vehicle tankers or by barrels to various industrial customers. The Battle Creek City water supply wells, commonly referred to as the "Verona Wells," are located northwest of these two sites.

Surrounding the Thomas Solvent operation sites are other industrial operations including the Grand Trunk Western Railroad Regional Switchyards and Roundhouse and Administration Facilities, the Michigan Livestock Exchange Stockyards,

Reith–Riley Asphalt Plant, and other commercial enterprises. There are also a number of private homes scattered throughout the same general area. Thomas Solvent contends that it not only secured insurance coverage in the form of general comprehensive liability insurance to cover its operations, but secured automobile liability insurance coverage to cover its transport vehicles as well. Thomas Solvent Brief in Support of Insurance Carriers' Duty to Defend at 4.

In 1984, the State of Michigan, through its Attorney General and the Department of Natural Resources, filed suit in the Circuit Court for the County of Calhoun, alleging that the groundwater beneath the lands and premises occupied by Thomas Solvent Company was contaminated by the presence of industrial solvents. The suit also alleged that the aquifer, or groundwater flow, carried the contaminated groundwater to the City of Battle Creek. It was further alleged that not only the Verona Wells but also individual private wells surrounding the residential area were being contaminated from the same source. After an emergency hearing, the court found that the earth and groundwater beneath the Thomas Solvent sites indeed contained contaminants and granted injunctive relief. The court entered a cease and desist order of operations with respect to the company's handling of hazardous industrial chemicals and ordered the parties to devise a remedial plan. When the projected costs of the proposed plan allegedly exceeded the assets of the company, Thomas Solvent Company filed a petition in bankruptcy. A plan of liquidation of the corporation is apparently still pending.

Plaintiff USF & G filed this declaratory judgment action against its insured, Thomas Solvent Company and Thermo–Chem, Inc., and against other insurers of Thomas Solvent—or one or more of its related corporate entities (hereinafter collectively referred to as "Thomas Solvent"). In addition to the previously mentioned Calhoun County suit, Thomas Solvent is a named defendant in several other lawsuits which allege that Thomas Solvent is responsible for groundwater pollution in and around

the Verona Well Field in Calhoun County, Michigan. Those suits (hereinafter collectively referred to as the "underlying actions") include *Kelley, et al. v. Thomas Solvent,* Calhoun County Circuit Court File No. 84–72–CE (*"Kelley"*); *Allen, et al. v. Thomas Solvent, et al.,* Calhoun County Circuit Court File No.'s CA84–3331–NO and 85–1971–NO (*"Allen"*); *Adkins, et al. v. Canadian National Railways, et al.,* Calhoun County Circuit Court No. 84–3081–CE (*"Adkins"*); *Kelley, et al. v. Thomas Solvent, et al.,* U.S. District Court File No. K86–164CA8; and *United States v. Thomas Solvent, et al.,* United States District Court No. K86–167CA8 (*"CERCLA actions"*). *See,* respectively, Exs. "H," "I," "J," "K," and "L" attached to USF & G's Motion for Summary Judgment.

The *"Allen"* and *"Adkins"* actions are still pending. There are approximately seventy-five (75) party plaintiffs in each action all of whom are residents of the immediate area surrounding the Thomas Solvent sites. Those plaintiffs seek recovery for personal injuries alleged to have occurred or which may occur as a result of contamination of their private wells and the ingestation of contaminants, and for the diminution of real estate property values as well.

The *Allen* plaintiffs have intervened, with permission, in this lawsuit seeking "to preserve indemnification for Thomas Solvent and thereby secure a source of recovery should they prevail in their state claims." *See* Intervening Plaintiffs' Response to Motion for Summary Judgment at 7. In addition, intervening defendant Grand Trunk Western Railroad has joined this action seeking indemnification from the insurance carriers for any liability attributed to it as the owner of a parcel of land used by Thomas Solvent in its Battle Creek operation. *Id.*

The other two actions are, of course, still pending in this Court. Plaintiff Frank J. Kelley, Attorney General of the State of Michigan, seeks relief under provisions of the Comprehensive Environmental Response Compensation & Liability Act ("CERCLA") for remedial costs, damages

to the environment and clean-up costs in order to eliminate the contamination of the Verona Wells. Similarly, plaintiff United States seeks relief for remedial and clean-up costs pursuant to CERCLA (collectively referred to as the "CERCLA" actions).

I must make a determination, guided by Rule 56 of the Federal Rules of Civil Procedure, as to each of these suits with respect to each of the previously mentioned insurers only on the issue of the duty to defend. The affidavits of James M. Sullivan and Robert P. Hamilton (Exs. "F" and "N") as well as the Answers of Canadian, Northbrook, St. Paul and Hartford to USF & G's interrogatories (Exs. "B," "C," "D," and "E") establish that Thomas Solvent notified its insurers of the actions filed against it and requested that each insurer provide a defense in the previously mentioned underlying actions. All of the carriers, with the exception of USF & G, refused to provide a defense. At this time USF & G seeks only a determination as to which of the previously mentioned insurance companies have a duty to defend their insureds in the underlying lawsuits. In addition, USF & G asks me to rule on which, if any, of the companies must pay a pro rata share of the past and future defense costs and to determine the amount of each pro rata share. USF & G argues that the complaints in the underlying actions make general allegations of a series of events alleged to have occurred over a number of years and do not allege specific dates for individual occurrences. Plaintiff argues further that only after the underlying suits have been completed can there be a determination of the number of dates, if any, of "occurrences"—a finding, plaintiff argues, more relevant to the duty to indemnify.

In the main defendants argue the following: 1) that the damage upon which the claim is based was expected and/or intended by the insured and that therefore there is no "occurrence" within the meaning of the policy; 2) that the damage did not take place during the policy period; and 3) that the existence of a so-called "pollution exclusion" clause relieves it from its duty to defend. Some variation of all three of these arguments is raised by various individual carriers either in response to USF & G's motion or by St. Paul's motion for summary judgment—perhaps, more accurately, a cross-motion for summary judgment. I note that Canadian has not filed a separate brief but has filed instead a memorandum response in which it incorporates by reference the arguments set forth in Northbrook's response brief and St. Paul's brief. I will structure my opinion, in part, by responding to each of these arguments *seriatim.*

Moreover, I believe it proper to consider those arguments and motions only *as they relate to the duty to defend.* For example, it is clear that where an insurer specifically excludes coverage with clear and unambiguous policy language, that express exclusion will relieve the insurer of the obligation to defend. In addition, such exclusion issues are routinely raised and considered in motions for summary judgment. *Cf. e.g., American States Ins. Co. v. Maryland Cas. Co.,* 587 F.Supp. 1549 (E.D.Mich. 1984).

Here, those "defenses," at least with respect to the duty to defend issue, have already been raised and adequately briefed by the parties. USF & G's motion to defer consideration of issues raised in defendants' motions was clearly filed for the purpose of deferring consideration of *the duty to indemnify issue* raised in the motion for summary judgment filed by St. Paul and in Northbrook's motion in opposition. *See* USF & G's Motion to Defer Consideration at 2–3 (Pl. # 182). Plaintiff's concern was that a "premature examination of the ultimate issues in this case" would bind it and other insurers by one ruling. *Id.* at 3, ¶ 8. While I agree, in general, with plaintiff's latter statement and concerns, I note that courts routinely address those arguments when raised. I understand the purpose of the Magistrate's order and the spirit of the agreement of the parties to be merely a case management device, and I find that it was not intended, nor was it considered to function as, a motion in limine or advanced ruling with respect to the duty to indemnify issue. Nonetheless, I have allowed plaintiff to respond to the occurrence and

exclusion issues insofar as the Magistrate's previous order indicated that those issues would not be considered at all in my decision. Plaintiff has filed a supplemental brief on those issues on December 1, 1987. In addition, on December 8, 1987, St. Paul filed a response brief to USF & G's supplemental brief re: "occurrence."

However, because I find that there are factual issues as to all these arguments or "defenses" concerning the duty to defend, I, as the following analysis will make clear, cannot grant St. Paul's cross-motion for summary judgment. I believe, however, that USF & G's motion for summary judgment must be granted in part.

Although USF & G did not formally brief all these previously mentioned arguments, —apparently in reliance on the Magistrate's previous order now vacated by me— USF & G argued early on that those issues are "irrelevant" to a proper analysis of the duty to defend. Put differently, I understand plaintiff's argument in part to be that there are factual issues with respect to those defenses—which are *primarily* relevant to the duty to indemnify—and that therefore I should not consider them in a motion for summary judgment. I believe that USF & G will not be prejudiced by an analysis concerning the duty to defend in that I do not find it necessary to make any factual findings relating to the ultimate issues in this case or otherwise "prematurely" examine or finally decide the issue of "occurrence" as it relates to the duty to indemnify. In addition, of course, I now have USF & G's supplemental brief.

Finally, plaintiff's original motion for summary judgment reveals that it recognizes the necessity for some discussion of, at least, the exclusion clause. It is clear that in order to be relieved from its duty to defend, the insurer must demonstrate that the allegations of the complaint bring the complaint solely within the province of the policy exclusions and that the allegations, when taken as a whole, can be put to no other reasonable interpretation. Plaintiff's argument implies as much. Plaintiff asserts that "unless and until it can be shown [in the underlying cases] that the polluting

events were not in fact 'sudden and accidental,' this Court should not find that the pollution exclusion relieves these insurers of their contractual duty to defend." Plaintiff's Brief in Support at 19.

Nevertheless, in appropriate cases courts have found that there is no duty to defend and/or indemnify because there has been no "occurrence" and/or because the allegations of the complaint fall within the pollution exclusion clause. *See e.g., Great Lakes Container v. National Union Fire Insurance Company*, 727 F.2d 30 (1st Cir. 1984). In any event my initial inquiry should be confined to whether the complaint, on its face, establishes coverage or lack of coverage.

I emphasize that even without plaintiff's supplemental brief there are ample materials filed in support of plaintiff's motion which address the occurrence and exclusion arguments with respect to the duty to defend. *See e.g.,* Brief in Support of Determination of Insurance Carriers' Duty to Defend at 14–19; 30–41 (Pl. # 198); *see also* Intervening Plaintiffs' Response to St. Paul's Motion for Summary Judgment (Pl. # 202).

Plaintiff concludes that if I find a duty to defend, plaintiff ought to be reimbursed for its past defense costs and that the future defense costs ought to be divided equally among those carriers whom I find have a duty to defend. Plaintiff, of course, argues that those carriers should include itself (USF & G), Canadian, Northbrook, St. Paul, Hartford, and, apparently, Continental. In the alternative, USF & G argues that should I find that there is no duty of defense owed by the respondent insurers, then I should find that USF & G has no continuing duty to defend and may therefore withdraw its defense in the underlying suits.

*The Policies*

USF & G's argument is straightforward. USF & G argues that all of the policies issued by the carriers contain essentially identical provisions with respect to the duty to defend. Plaintiff asserts that under Michigan law an insurer must defend a claim where any of the allegations of the com-

plaint fall within, or arguably fall within, the coverage provided. *Cf. St. Paul Fire and Marine Insurance Company v. Parzen,* 569 F.Supp. 753, 755 (E.D.Mich.1983). In *Detroit Edison Co. v. Michigan Mutual Ins. Co.,* 102 Mich.App. 136, 301 N.W.2d 832 (1980), the Michigan Court of Appeals described in some detail an insurer's duty to defend.

> The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. *Dochod v. Central Mutual Ins. Co.,* 81 Mich.App. 63; 264 N.W.2d 122 (1978). The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Co. v. Maryland Casualty Co.,* 73 Mich.App. 62; 250 NW2d 541 (1976). In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. 14 Couch on Insurance 2d, § 51:45, p. 538.

102 Mich.App. at 141–142, 301 N.W.2d 832. (Emphasis in original.)

One party, Northbrook, has also raised a choice of laws question. While I will address that concern in due course, for now, I will merely examine the relevant provisions of each of the CGL policies and then turn to the allegations of the underlying complaints, considering the theories of liability advanced in each, as a first step in determining whether and to whom the duty to defend—as defined by Michigan law—attaches.

The CGL insurance policies issued by USF & G, St. Paul and Northbrook and the general liability policies issued by Canadian all contain the following standard form language.

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:
>
> A. Bodily injury; or
>
> B. Property damage.
>
> To which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.
>
> Occurrence is defined: 'Occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The policies also contain a standard 'pollution exclusion' which indicates that the policies do not apply.

> "(f) to *bodily injury* or *property damage* arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;"

The Hartford Business Auto Policies contain the following similar language:

A. WE WILL PAY.

1. We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to

which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.

2. We have the right and duty to defend any suit asking for these damages. However, we have no duty to defend suits for bodily injury or property damage not covered by this policy. We may investigate and settle any claim or suit as we consider appropriate. Our payment of the Liability Insurance limit ends our duty to defend or settle.

The USF & G Comprehensive Automobile Liability policies, at least since 1975, contain the following language:

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

A. Bodily injury; or

B. Property damage.

To which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

### The Complaints and the Duty to Defend

Plaintiff argues that all of the underlying complaints are based upon the alleged release of pollutants by Thomas Solvent into the surrounding groundwater. Plaintiff argues that both the enforcement actions seeking "injunctive relief" as well as the citizens' suits seeking damages for property damages and personal injuries give rise to a duty to defend. The complaints all allege that contamination was discovered in 1981 and all allege or imply that the contamination emanating from Thomas Solvent began a number of years before 1981—possibly as early as 1970.

■ Before proceeding with an analysis of the individual complaints, there is a threshhold jurisdictional issue which must be resolved. (I believe that I have previously exhausted the standing issue and have, in a manner of speaking, put it to rest. To summarize, I have determined that with respect to the duty to defend issue presently before me, there is a justiciable controversy and that USF & G has standing to raise that issue.) *See* Court's Opinions of August 7, 1987 and September 11, 1987 (vacating August 7th opinion and granting plaintiff's motion for reconsideration and clarification).

### Northbrook's Objections to the Magistrate's Report and Recommendation

On July 10, 1986, I directed all parties to submit briefs on the issue of whether this case should be dismissed in light of three recent decisions of the Sixth Circuit: *Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.*, 791 F.2d 460 (6th Cir.1986); *American Home Assurance Co. v. Evans*, 791 F.2d 61 (6th Cir.1986); and *Grand Trunk Western R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323 (6th Cir. 1984) (hereinafter "the Sixth Circuit cases.") On August 18, 1986, Magistrate Rowland entered a Report and Recommendation indicating that I should retain jurisdiction. Defendant Northbrook argues that the Sixth Circuit cases send a clear message that district courts ought to exercise their discretion to hear this type of declaratory judgment action "very sparingly." Northbrook's Brief in Support of Objection to Magistrate's Order Retaining Jurisdiction at 4.

Plaintiff argues that Northbrook's objections and arguments were previously raised in its original brief dated July 21, 1986 as well as in its brief in support of objections dated August 27, 1987. Plaintiff emphasizes that Magistrate Rowland previously addressed these arguments at a status conference held August 15, 1986 which

Northbrook did not attend. In any event, I have reviewed this issue *de novo*. Not only do I find no error in the Magistrate's order, I find that intervening case law has actually provided additional support for the Magistrate's decision.

In *Allstate Insurance Company v. Green*, 825 F.2d 1061 (6th Cir.1987), the Sixth Circuit sent a clear message that district courts should *use* their discretion when faced with declaratory judgment actions of this type rather than simply dismiss based upon an allusion to the Sixth Circuit cases mentioned above. Moreover, *Green* emphasized that where the grant of declaratory relief in insurance coverage cases would undoubtedly settle the controversy over the insurer's liability to provide a defense for and/or to indemnify its insured, a district court can entertain the action.

Further, here I see no evidence of "procedural fencing," nor is there any indication that my decision would increase friction between federal and state courts or otherwise encroach, improperly, upon state jurisdiction. Finally, it appears to me that there is no alternative remedy which can be said to be better or more effective. At this point, I believe an "early" resolution of this matter will benefit all the parties. Put differently, I do *not* believe that "considering the purposes of the Federal Declaratory Judgment Act, the [insurer] should be forced into a waiting period of legal uncertainty respecting the obligations it has incurred in its policy." *Green*, 825 F.2d at 1066. In sum, I find it proper to proceed in my determination of the duty to defend issue with respect to the three state complaints at issue as well as the two CERCLA claims and find that the holding in *Green* actually encourages such action. Accordingly, I will enter an order rejecting Northbrook's objections to the Magistrate's Report and Recommendation and Order of August 28, 1986.

I will not return to an analysis of the underlying complaints.

### The Adkins Complaint

Paragraph 85 of the *Adkins* complaint alleges that defendants:

... have been engaged and interwoven as a long standing common enterprise in the business of selling industrial solvents and other dangerous toxic chemicals and transporting liquid industrial waste, particularly used solvents, to recycling and disposal facilities.

Paragraph 86 alleges that Thomas Solvent was licensed to haul liquid industrial wastes from 1970 through 1981.

Paragraph 99 alleges:

... *at all times* during the emergence, development and use of these industrial sites (as described in paragraphs 81 and 98) dangerous toxic chemicals and industrial wastes were permitted to and did seep, leak, drain, pour or empty into the porous soils of said site, fence, filtrating, percolating and migrating into and through the aquifer system ... (emphasis added).

Paragraph 111 alleges:

... *throughout the span of time encompassing the activity involved at the ... Thomas Solvent sites ...* numerous reported incidents involving the accidental or intentional release of such substances occurred, attesting to the process of contamination underway. (emphasis added).

Paragraphs 114 and 116 (sic) allege the relevant time period to be "more than a 12 year period."

Paragraph 131 alleges:

... the filtration, percolation, migration and escape of dangerous toxic chemicals and industrial waste products as described above has occurred on occasion *in a sudden and accidental manner.* (emphasis added).

More specifically, paragraphs 134 and 135 allege:

... an occurrence or occurrences took place whereby dangerous toxic chemicals, industrial waste and chemical vapors were permitted to escape ... (and) the occurrences described in 134 above took place *in a sudden and accidental manner.* (emphasis added).

*The Duty to Defend*

█ I note that, in general, CGL insurers, including those involved in this case, must provide a defense to their insureds where the insured is charged with causing damage or injury arising out of the dumping, transporting, generating or handling of hazardous waste. *See e.g., Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220 (Me.1980). Further, where an insurer's arguments disclaiming a duty to defend hazardous waste claims are factual and/or are based upon facts outside the complaint(s) against the insured, courts generally rule that such claims must be defended. *See e.g., Mercury Refining Co. v. Hartford Fire Insurance,* 84–CV–495 (N.D.N.Y. July 19, 1985) (granting plaintiff's motion for partial summary judgment on issue of insurer's duty to defend an underlying Superfund action); *see also Technicron Electronics Corp. v. American Home Assurance Co.,* No. 08811/85 (N.Y.Sup.Ct. Feb. 13, 1986) (granting plaintiff's partial summary judgment finding insurers had duty to defend where insurers failed to establish that there was no possible factual or legal basis on which they might eventually be obligated to indemnify insured); *Niagara County v. Utica Mutual Insurance Co.,* 80 A.D.2d 415, 439 N.Y.S.2d 538 (4th Dep't 1981) (insurer must defend if only some of the allegations arguably fall within the coverage provisions even if others do not).

I concede that there is some contrary authority which indicates that insurers should not be required to defend until unresolved issues concerning the nature of the claims in the underlying actions and the timing of the damage can be addressed. *See e.g., CPS Chemical Co. v. Continental Insurance Co.,* 203 N.J.Super. 15, 495 A.2d 886 (1985) (reversing trial court's grant of summary judgment against insurers on the issue of duty to defend a pollution liability claim). These cases, however, clearly represent the minority view and there is no indication that this is the trend under Michigan law.

█ It is clear that here the CGL insurers' duty to defend attaches if the plaintiffs in the underlying complaints have advanced any theories of recovery which arguably fall within the coverage. On the other hand, if an insurer specifically excludes coverage with clear and unambiguous policy language, such express exclusions will relieve the insurer of the duty to defend. *North River Insurance Company v. Endicott,* 151 Mich.App. 707, 391 N.W.2d 454 (1986); *Illinois Employers Insurance v. Dragovich,* 139 Mich.App. 502, 362 N.W.2d 767 (1984). As I have indicated, many of the allegations contained in the *Adkins'* complaint obviously fall within policy coverage. Moreover, under Michigan law the duty to defend is distinct and independent of an insurer's duty to pay. *Stockdale v. Jaimison,* 416 Mich. 217, 330 N.W.2d 389 (1963).

*St. Paul's Motion for Summary Judgment*

█ To the extent that St. Paul's Motion for Summary Judgment contains arguments germane to the duty to defend issue, the Court believes that it is proper to consider them here. St. Paul asserts that it issued a policy to Thomas Solvent on November 1, 1983 and cancelled the policy on March 19, 1984. St. Paul argues that the policy is void *ab initio* because the insurance was fraudulently obtained and because the insurance would never have been issued had St. Paul known of Thomas Solvent's "pollution history." I note that there are genuine issues of material fact as to whether the St. Paul policy was obtained by fraud and misrepresentation. Therefore, its motion for summary judgment based on its *ab initio* argument must fail.

Although St. Paul argues that Alexander & Alexander ("A & A") misrepresentated basic facts by failing to reveal Thomas Solvent's pollution history, the original "submission letter" of A & A indicated at least that Thomas Solvent was in the business of repacking, mixing, blending wholesale solvents but was not a manufacturer of solvents. *See* Ex. A. at 38, attached to Defendant Grand Trunk's Brief in Response to St. Paul's Motion for Summary Judgment. Moreover, St. Paul apparently declined to offer coverage to Thomas Sol-

vent, but arguably agreed to provide coverage "as a favor" to A & A. *See* Deposition of Frederick Hanbury, at 28, in. 23; 29, ln. 12; Dept. of Richard Dunn Paraventi, at 11, lns. 4–11. Grand Trunk argues, and the Court agrees, that there is a genuine issue of material fact here as to whether the initial refusal juxtaposed with the subsequent "favor" to A & A indicates or suggests that St. Paul knew of the pollution risk but was asked to provide and did provide coverage "as a favor."

In addition, Grand Trunk argues there is also a question of fact as to whether St. Paul would have issued a policy had it known of Thomas Solvent's "pollution history." The affidavit of Benjamin Lane, a St. Paul underwriter, asserts that had all of the past facts, the so-called history of pollution—including any on-going investigations and/or the EPA or MDNR claims—been known, "under no circumstances would [Mr. Lane] have authorized [that] a comprehensive general liability policy be issued by St. Paul...." *See* Ex. 5 of St. Paul's Motion for Summary Judgment, ¶ 10; and ¶¶ 9–12. However, Grand Trunk argues that Mr. Lane's affidavit is inconsistent with the language of the policy itself which attempts to exclude only certain types of pollution, that is, that which is not "sudden and accidental," from its coverage. Again, Grand Trunk argues that the existence of the exclusion clause suggests that St. Paul knew of the pollution risk and made a decision to exclude certain types of pollution from coverage and to insure other types.

Finally, I find there are questions of fact which pertain to the issue of whether A & A was actually acting as the agent of St. Paul or Thomas Solvent. Accordingly, I find that St. Paul has not carried its burden of establishing the non-existence of any genuine issue of material fact that it is entitled to summary judgment—based upon its first argument—with respect to the duty to defend. *See* Rule 56(c) of the Federal Rules of Civil Procedure. I note that my review of the numerous documents attached to St. Paul's response brief re: occurrence does not alter my view that there still remain genuine issues of materi-

al fact concerning whether the St. Paul policy was obtained by fraud and misrepresentation. I offer, of course, no opinion with respect to the ultimate outcome of the *ab initio* argument or the merits of the case, but merely hold that St. Paul's motion must be denied at the present time.

■ St. Paul's second argument is that the contamination of the Battle Creek water supply and the alleged resulting harm occurred long before November 1, 1983— the date when St. Paul's policy commenced. However, the *Adkins* complaint filed December 12, 1985 indicates, for example, that "... the trespass [migration of toxic chemicals] upon the property and into the dwelling place of the Plaintiffs was injurious to the health and well being of the Plaintiffs *[and] the trespass continues to this day.*" (emphasis added). *See Adkins* complaint at ¶¶ 151–152.

*The Definition of Occurrence*

■ St. Paul argues further that there has been no "occurrence" as that term is defined in the policy. An "occurrence," as I have previously indicated, is defined in these CGL policies as "an accident, *including continuous or repeated exposure to conditions,* which results in bodily injury or property damage *neither expected nor intended from the standpoint of the Insured.*" (emphasis added). *See* Ex. 23 attached to St. Paul's Brief in Support of Motion for Summary Judgment.

When does an "occurrence" occur? I start from the basic proposition that "an 'occurrence' policy protects the policy holder from liability for any act done while the policy is in effect, whereas a claims made policy protects the holder only against claims made during the life of the policy." *St. Paul Fire and Marine Ins. Co. v. Barry,* 438 U.S. 531, 535, 98 S.Ct. 2923, 2926, 57 L.Ed.2d 932 (1978). It is undisputed that the policies at issue here are occurrence policies. Plaintiff argues that since the complaints allege continuous releases, that is, at least up to the time the suits were filed, for that reason the complaints necessarily include all of the carriers, and

since it is impossible to tell—from the allegations in the complaint at least—precisely when the releases occurred, I should hold that all the insurers have a duty to defend.

St. Paul concludes that the facts of this case establish that it cannot be said that any bodily injury or property damage which allegedly occurred during the St. Paul policy period was not expected or intended from Thomas Solvent's standpoint. St. Paul argues that the facts establish that at the very least Thomas Solvent *expected* bodily injury or property damage during the St. Paul policy period. In support of its position, St. Paul argues that the deposition of Mr. Thomas Solvent establishes that prior to the mid–1970's residual chemicals from the drums would be discharged into the ground as part of the regular drum cleaning process. Thomas Dep. at 47, ln. 5; at 48, ln. 1 (Ex. 25). St. Paul argues further that Mr. Thomas's deposition indicates that the cleaning process was changed in the mid–1970s so that material was then put in drums and shipped off-site or stored on site. *Id.* at 48, lns. 2–5. Moreover, St. Paul asserts that Mr. Thomas's deposition establishes that he was aware of relevant legislation which at the time put him on notice that allowing chemicals to seep into the ground was dangerous. *Id.* at 48. ln. 6–8.

St. Paul considers it more significant with respect to Thomas Solvent's expectations of bodily injury or property damage that funds were provided by Thomas Solvent in late 1982 to supply bottled water to residents who had been using contaminated wells. St. Paul concludes that any bodily injury or property damage which occurred during the policy was expected by Thomas Solvent and is therefore excluded from coverage since the policy does not provide coverage for damages which are expected or intended by the policyholder.

In response to St. Paul's argument, Thomas Solvent argues that his testimony actually indicates that since the mid–1970s any surface spillage was completely accidental and unintentional. Thomas Solvent also offers the affidavit of Charles S. Annett, a water quality expert, which attests that "it is a realistic possibility that the total volume of contaminants detected at the site *could be attributed to a gradual, long-term leakage from five underground tanks at a non-detectable rate of release.*" (emphasis added). *See* Aff. of Charles S. Annett attached to Thomas Solvent's Brief in Support of Insurance Carriers' Duty to Defend at Ex. 13. Further, Thomas Solvent offers the letter of John Voelpel which indicates that although Thomas Solvent did provide funds for bottled water at the request of the Michigan DNR, he did so with the clear understanding that his actions were not an acknowledgement that any injury, loss or damage had been caused or was being caused by him. *See* Ex. 16 attached to St. Paul's Brief.

After reviewing the relevant depositions and supporting documentation, I find that there are material facts as to whether any, or all, of the pollution was expected or intended. I have set forth the argument above in part to demonstrate that St. Paul would have me go beyond the complaint in determining the duty to defend. I find that inquiry unnecessary and its undertaking unpersuasive at this point with respect to the duty to defend. The *Adkins* complaint clearly alleges that the *discharge* was sudden and accidental. It is true that the complaint does not use the words "unintended or unexpected" with respect to its allegation that there has been a (continuous) occurrence. Nevertheless, the common meaning of the words "sudden and accidental" satisfies me that the complaint alleges, among other things, that the occurrence(s) were unintended, that is, "accidental" from the standpoint of the insurer. *Cf. Adkins* Complaint at 23, ¶ 135 ("the occurrences described ... took place in a sudden and accidental manner.")

Accordingly, it is clear to me that an occurrence may have happened during all the policy periods in question and for that reason St. Paul—as well as the other CGL insurers, have a duty to defend. *Cf. Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 73 (E.D.Mich.1987) (Judge Feikens noting that "each exposure of the environment to a pollutant constitutes an occurrence and triggers cover-

age."); *see also Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220 (Me.1980) (court found an "occurrence" and a duty to defend where the complaint contained allegations that were arguably covered. The allegations indicated that the release of toxic substances might be shown to have been unexpected and unintended.)

I note that St. Paul makes much of the argument that the terms *"[un]expected or [un]intended"* are contained in the policy's definition of "occurrence" and refer to unintended and unexpected damages, as opposed to the action or event of discharging hazardous wastes. St. Paul insists that what constitutes an "occurrence" is a wholly separate test from that of the sudden and accidental release of contaminants. This is important, argues St. Paul, because another policy provision, the "pollution exclusion," excludes coverage for all discharges of hazardous wastes unless they are "sudden and accidental."

Put differently, St. Paul asserts that the pollution exclusion focuses on the discharge or release, *not the damages* resulting from the discharge or release. Ironically, as support for its contention that the "narrow pollution exclusion is clear and unambiguous" it refers the Court to *Transamerica Ins. v. Sunnes,* 77 Or.App. 136; 711 P.2d 212, 214 (1985) ("The exception to the exclusion clause is concerned only with whether the discharge or release of pollutants is accidental or *intended* and not with whether the resulting damage was also intended.") St. Paul's Brief in Support at 30, n. 41. Here, of course, the *Transamerica* court itself to some extent conflated or perhaps confused the "precise" and purportedly unambiguous language defining the two "tests": "sudden" and "accidental" (the exception to the exclusion exemption) on the one hand, and "[un]intended" or "[un]expected" (the qualifying language relating to the definition of "occurrence") on the other. That is, the language drawn from *Transamerica* asserts that the "narrow and unambiguous" pollution exclusion terms *"sudden and* accidental" can be glossed "accidental *or intended."* *Transamerica* replaces the conjunctive

with the disjunctive and substitutes "intended" for "sudden."

In *Transamerica,* the Oregon Court of Appeals actually held that because the pollution damage arising out of the insured's water deionization and softening business was *not* intentional, there was an "occurrence" within the meaning of the policy. Yet, the court concluded that the exclusion provision barred coverage because the insured *intended* to discharge the waste material directly into the sewer system and did so regularly over a ten-year period.

On the other hand, St. Paul takes a recent Michigan Court of Appeals panel to task for "improperly equat[ing] the unintentional and unexpected release of waste with the sudden and accidental exception to the pollution exclusion." St. Paul's Brief in Support at 30. *See Jonesville Products, Inc. v. Transamerica Insurance Group,* 156 Mich.App. 508, 402 N.W.2d 46 *app. den. Jonesville Products, Inc. v. Transamerica Ins. Group,* 428 Mich. 897 (1987). While I will discuss the *Jonesville* decision in more detail in the following section which analyzes the exclusion clause and its exception, I have alluded to the *Jonesville* and the *Transamerica* decisions within this "occurrence" section, in part, to demonstrate the difficulty courts have in finding and/or in supporting a finding that either the terms "accidental and sudden" or "[un]intended" or "[un]expected" are unambiguous contract terms.

■ A number of courts have succeeded, in part, in illustrating the linguistic labyrinth and conceptual conundrum that these policy provisions have created. In interpreting the identical policy language defining an "occurrence," the Ohio Court of Appeals in *Buckeye Union Ins. v. Liberty Solv. & Chemicals Co. Inc.,* 17 Ohio App. 3d 127, 477 N.E.2d 1227 (1984) said:

... the term 'occurrence' is much broader than the term 'accident' ...

To begin with, the word 'occurrence,' to the lay mind, as well as to the judicial mind, has a meaning much broader than the word 'accident.' As these words are generally understood, accident means something that must have come about or

happened in a certain way, while occurrence means something that happened or came about in any way. Thus accident is a special type of occurrence, but occurrence goes beyond such special confines and, while including accident, it encompasses many other situations as well.

... *while the activity which produced the alleged damage may be fully intended, and the residual results fully known, the damage itself may be completely unexpected and unintended.*

[F]or the purposes of determining [the] duty to defend ... [c]ourts and commentators alike are in agreement that the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured. (citations omitted) (emphasis added).

Further, in *United Pacific Insurance Company v. Vans Westlake Union Inc.*, 34 Wash.App. 708, 664 P.2d 1262 (1983) the court determined that a gasoline leak which emanated continuously (for several months) from a small hole in an underground gasoline pipe was an 'occurrence' within the meaning of a typical CGL policy. Area businesses sued after traffic was closed off for a number of weeks so that the gasoline could be pumped out of the ground. The court noted that the underlying events were 'occurrences' within the meaning of plaintiff's CGL policies. The court said:

■ In the case before us, the liability insurance policy on the one hand covers an 'occurrence,' which by policy definition includes conditions which are continuing in nature (as the insured argues), while on the other hand the pollution exclusion clause in the policy excludes from coverage damages arising out of the escape of liquids, gases and other substances unless the escape is sudden (as the insurer argues is the situation presented). Both cannot be true yet both positions are reasonable, hence, the policy is ambiguous and requires judicial interpretation. It then follows that ambiguities in the policy are to be construed against the insurer which wrote the policy and in favor of the insured— particularly where an exclusion is in-

volved as it is here. *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wash 2d 641, 650, 548 P2d 302 (1976).

664 P.2d at 1265.

Finally, in *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.*, 186 N.J.Super. 156, 451 A.2d 990 (1982), the court found a duty to defend in an action brought by private citizens alleging negligent contamination of groundwater resulting from seepage from a municipal landfill site. The court found the "occurrence" unexpected or unintended from the standpoint of the insured. The court noted that "[v]iewed from the standpoint of the (insured), the function of depositing the waste may have been intentional, but it was never expected or intended that the waste would seep into the aquifer resulting in damage and injury to others." *Id.*, 451 A.2d at 994.

I conclude that the *Adkins* complaint has alleged an "occurrence" within the meaning of the CGL policies at issue here so as to trigger the duty to defend.

*The Pollution Exclusion Clause*

■ The positions of plaintiff USF & G and the other carriers with respect to the meaning of the term, or terms, "sudden and accidental" are clearly antipodal. The gravaman of St. Paul's argument is that the pollution exclusion set forth in its policy bars coverage (and thus the duty to defend), and that the sudden and accidental exception to the exclusion does not apply. Plaintiff argues, by implication, that the defendant insurers cannot rely on the pollution exclusion clause because there are factual resolutions which must be made before I can make such a ruling. Specifically, plaintiff argues that "[u]nless and until it can be shown in [the underlying actions] that the polluting events were not in fact 'sudden and accidental,' this court should not find that the pollution exclusion relieves these insurers of their contractual duty to defend." Plaintiff's Brief in Support at 19.

Further, the fact that each side has marshalled substantial, albeit conflicting, authority from other jurisdictions with re-

spect to the "correct" interpretation of the exclusion provision and the correlative exemption terms suggests to me that the terms, as contract terms, may well be ambiguous. Put differently, while I concede that in a litigious society such as ours the mere controversy concerning the meaning of a contract term does not establish that it is ambiguous, this type of comprehensive debate comes close to proving the point. Perhaps more important, the insurance policy itself does not define the meaning of the terms "sudden and accidental." *Cf. Buckeye Union Ins. v. Liberty Solv. & Chemicals Co., Inc.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984) (noting that several courts have held that the fact that the terms "sudden and accidental" are not defined in a policy of insurance is itself enough to establish that the polluters exclusion clause is ambiguous).

Moreover, the Michigan Supreme Court recently catalogued six rules which it indicated were to be used in construing insurance exclusion clauses. *See Powers v. DAIIE*, 427 Mich. 602, 623–24, 398 N.W.2d 411 (1986) (in discussing whether an owned-automobile exclusion clause was contractually ambiguous, the court relied upon six general principles derived from case law interpretations of automobile and life insurance policies). The *Powers* court noted:

1) '[E]xceptions in an insurance policy to the general liability provided for are to be strictly construed against the insurer.' (citations omitted)

2) An insurer may not 'escape liability by taking advantage of an ambiguity....' *Hooper, supra* at 393. '[W]herever there are two constructions that can be placed upon the policy, the construction most favorable to the policyholder will be adopted.' (citation omitted)

3) An insurer must 'so ... draft the policy as to make clear the extent of nonliability under the exclusion clause.' (citation omitted)

4) An insurer may not 'escape liability by taking advantage of ... a forced construction of the language in a policy....' *Hooper, supra*. '[T]echnical construc-

tions of policies of insurance are not favored....' (citation omitted)

5) 'The courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words.' (citation omitted)

6) '[N]ot only ambiguous but deceptive.' '[T]he policyholder must be protected against confusing statements in policies....' (citation omitted)

*Powers*, 427 Mich. at 623–624, 398 N.W.2d 411.

The Court will endeavor to apply these principles, to the extent that they are applicable, in order to determine whether any or all of the carriers should be relieved of their duty to defend when the exclusion clause is applied to the allegations in the complaint.

Plaintiff relies heavily upon a recent Michigan Court of Appeals decision, *Jonesville, supra*. In *Jonesville*, the underlying complaint alleged that Jonesville Products Inc., "had permitted continuous discharge of Tricholorethylene ("TCE") onto its property, resulting in contamination of the Lapes' soil, contamination of its well water, and possible physical harm to the Lapes."

The court said:

We find that the circuit court [in holding that the insurer had no duty to defend] failed to distinguish between the frequency of acts which resulted in the release of contaminants and plaintiff's [insured's] knowledge or notice of the release of pollutants as a result of those acts. The ... [underlying complaint] did not specify ... how the toxic wastes entered the ground. There may have been either intentional dumping or burial, unintentional spills or leaks from inadequate containers, or other accidents. The allegations.... are couched in general terms and encompass unintentional release into the ground.

....

The circuit court erred in finding that the allegation of "continuous" negligent

discharge of waste ... took [the underlying complaint] ... out of defendant's [insured's] exception for "sudden and accidental" release. It is possible that the releases could have been sudden, i.e., unexpected, and accidental, i.e., unintended, and thus outside the exclusion.

*Jonesville,* 156 Mich.App. at 512, 402 N.W. 2d 46.

I concede that the *Adkins* complaint alleges both intentional and non-intentional (negligent) act(s)—that is, a continuous negligent discharge from approximately 1973 to the time the complaint was filed in 1985, but as I have previously indicated, when determining the duty to defend, so-called mixed theories or conflicting theories of liability will not relieve a carrier of its obligation to defend. This rule is consistent with the *Jonesville* court's conclusion that "[i]t was the duty of defendant [insurer] to undertake the defense *until it could confine the claim to a recovery that the policy did not cover.")* (emphasis added). This pronouncement of a broad duty to defend is consistent with and is in part a restatement of the test set forth in *Detroit Edison,* 102 Mich.App. at 142 (duty to defend exists where claims are merely arguably within the province of the policy). *Cf. Mt. Hope Inn v. Travelers Indem. Co.,* 157 N.J.Super. 431, 384 A.2d 1159 (Law Div. 1978).

I observe that in *Jonesville,* a court once again used the words "sudden," "unexpected," "accidental," and "unintended" almost interchangeably. *Cf. Lansco, Inc. v. Dep't of Environmental Protect. of State,* 138 N.J.Super 275, 282, 350 A.2d 520 (Ch. Div.1975), *aff'd* 145 N.J.Super. 433, 368 A.2d 368 (App.Div.1976), *cert. den.* 73 N.J. 57, 372 A.2d 322 (1977) (noting that the common meaning of "sudden" is "happening without previous notice or on very brief notice: unforeseen; unexpected; unprepared for." Webster's International Dictionary (2d ed. unabrid. 1954); Black's Law Dictionary (4 ed. 1968)." It may well be that this matter is simply beyond the judicial ken. At least one court has observed that "the words 'sudden' and 'accidental' have been interpreted by recognized dictionary definitions to include *unexpected* and

*unintended* events." *CPS Chemical Company, Inc. v. The Continental Insurance Company and United States Fidelity and Guaranty Company,* 199 N.J.Super. 558, 489 A.2d 1265 (1984) (emphasis added). Perhaps it will take the etymological efforts of the late John Ciardi, or perhaps a column from William Safire or some other contemporary wordsmith to adequately trace and retell the history of these contractual cognates as they developed distinct connotations from their [apparently] once common form. Until that day it appears we will have to live with and within the ambiguity.

I have given the matter much thought and after independent research believe that the better reasoned cases rely upon the "unintentional/intentional" dichotomy in interpreting the pollution exclusion clause and the exceptions to that clause, rather than upon the *apparent* distinction between the term *"continuous"* (drawn from the contractual definition of "occurrence") and *"sudden"* (the key words drawn from the "sudden and accidental" exception to the exclusion clause). Whereas the latter line of cases necessarily finds the exclusion clause clear and unambiguous, the former line concludes that the clause is clearly ambiguous.

In *Jackson Township, supra,* the court demonstrates how the exclusion clause can be read to include continuous actions so long as the resulting "injury" or damage was neither expected nor intended.

Thus almost unanimously, the courts in other jurisdictions go one step beyond *Lansco, Inc. v. Dep't of Environmental Protect. of State, supra,* in finding that the pollution clause is ambiguous. In *Lansco,* the occurrence was sudden and accidental because the event was unexpected, whereas in each of the other cases the court held the occurrence to be sudden and accidental because the result or injury was unexpected or unintended.

When viewed in light of the case law [previously] cited, the clause can be interpreted as simply a restatement of the definition of "occurrence" that is, that the policy will cover claims where the

injury was "neither expected nor intended." It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act. (citations omitted) The chemical manufacturer or industrial enterprise who discharges, disburses or deposits hazardous waste material knowing, or who may have been expected to know, that it would pollute, will be excluded from coverage by the clause. The industry, for example which is put on notice that its emissions are a potential hazard to the environment and who continues those emissions is an active polluter excluded from coverage. A municipal utilities authority, in the collection of liquid waste and the deposit of the waste in a township landfill, designated as authorized to accept the waste, is carrying out its public function. Viewed from the standpoint of the municipal utilities authority, the function of depositing the waste may have been intentional but it was never expected or intended that the waste would seep into the aquifer resulting in damage and injury to others. (citation omitted). Alternative language in the clause to indicate that the act of depositing, if intentional, would exclude coverage regardless of whether the pollution is expected or intended would have put the matter beyond reasonable question. (citation omitted).

Although the third-party complaint against the plaintiff is unclear as to how many times it deposited waste at the site, the frequency of dumping is not dispositive of the issue of whether the occurrence was sudden or accidental. If the inquiry is, as it should be, whether the pleadings charged the insured with an act resulting in unintended or unexpected damage, then the acts or acts are sudden and accidental regardless of how many deposits or dispersals may have been gradual rather than sudden, *the behavior of the pollutants as they seeped into the aquifer is irrelevant if the permeation was unexpected.* (citation omitted).

Also the word sudden as used in liability insurance need not be limited to an instantaneous happening (citation omitted). The term "sudden and accidental" must be construed in its relevant context. The relevant context to be considered is the fact that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured. Thus, regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the fact-finder, the total situation could be found to constitute an accident....

I find that the pollution exclusion clause can be interpreted so as to support a meaning favorable to plaintiff, Jackson M.U.A. I therefore find that the carriers owe a duty to defend. *Jackson Township*, 451 A.2d at 994–95 (emphasis added).

I believe that to the extent there exists a contrary line of cases that has found the exclusion clause clear and unambiguous, that line has at best ignored the context and connotations of "contract language" and, at worst, engaged in contractual revision. It seems to me that that mode of analysis certainly cannot be said to have adequately considered, must less advanced, the objectively reasonable expectations of the insured.

Commentators have observed that in 1966 the insurance industry broadened the meaning of accident in switching to "occurrence-based coverage" " 'in response to consumer demands for broader liability protection and in acquiesence to the judicial trend toward a more expansive reading of the term accident.' " Tyler and Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy,* 17 Idaho L.Rev. 497, 499 (1981) *cited in Broadwell Realty Services Inc. v. Fidelity & Cas. Co. of New York,* 218 N.J.Super. 516, 528 A.2d 76 (1987) (providing the most complete and scholarly account of the origin and development of the pollution exclusion clause in CGL policies). But to draft

an insurance policy that appears, on the one hand, to cover a pollution discharge that is "continuous" because it is an "occurrence," but, on the other hand, to say that the same policy is intended to exclude all "continuous discharges" *unless they are "sudden and accidental,"* glossed "unintentional and immediate," is to make every accidental, albeit continuous, "occurrence" fall outside of coverage. In almost Orwellian fashion, it is to make an "occurrence" an "unoccurrence." It is to deny coverage to all instances of "continuous discharge"—the most omnipresent and insidious form of pollution—whether such discharges are intentional or unintentional; whether they are "deliberate" or accidental.

Maybe the insurer intended to exclude all long-term, that is, "continuous" pollution claims without consideration of "culpability" of the policyholder. Perhaps all instances of groundwater pollution—whether the dispersal of contaminants is intentional or unintentional—are to be excluded. But to write a policy which includes a broad definition of occurrence ("continuous discharge") and where the exclusion clause is, in the main, coextensive with the definition of occurrence and *then* to allow for a very narrow exception to the exclusion—that is, where the pollution is "sudden and accidental"—is, at the least, confusing, if not deceptive to the policyholder. *CPS Chemical Company, Inc. v. The Continental Insurance Company and United States Fidelity and Guaranty Company,* 199 N.J.Super. 558, 489 A.2d 1265 (1984) (noting that while the drafters of the "sudden and accidental" clause may have believed that the phrase "connoted a sense of a dramatic catastrophe, limited in duration and immediate in its consequences," ... "it cannot fairly be said that this was unambiguously expressed.") It invokes a "hidden meaning" as to what, if any, instances of "unintentional" but continuous pollution will be covered and what instances will be excluded.

But the Michigan Supreme Court has cautioned that "[t]he courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, *when all question might have been avoided by a more generous or plainer use of words." Powers, supra,* 427 Mich. at 624, 398 N.W.2d 411, *citing Hooper v. State Mutual Life Assurance Co.,* 318 Mich. 384, 392, 28 N.W.2d 331 (1947). Further, "[t]he policyholder must be protected against confusing statements in policies...." *Powers, supra,* at 624, 398 N.W.2d 411, *citing Deland v. Fidelity Health & Accident Mutual Ins. Co.,* 325 Mich. 9, 17, 37 N.W.2d 693 (1949) (emphasis supplied).

Moreover, such "coverage" is inherently deceptive. It, in effect, excludes all long-term instances of pollution whether the insured is a knowing or an "innocent" polluter, that is, one who not only never intended to pollute the environment, but also took some positive, albeit in retrospect, insufficient, action to safeguard against unintentional spills or leaks.

Defendant argues that applying *Jonesville* to this case will thwart the important policy arguments supporting the pollution exclusion. *See Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688; 340 S.E.2d 374, 381 (1986) ("The policy reasons for the pollution exclusion are obvious: if an insured knows that liability incurred by all manner of negligent or careless slips and releases is covered by his liability policy, he is tempted to diminish his precautions and relax his vigilance."). St. Paul also cites *American States, supra,* for the same proposition. Whether the pollution exclusion would actually fulfill its stated purpose of bringing about a more careful handling of toxics and hence, less pollution, by imposing on businesses that handle toxics the "full" costs of the risks they breed is less than clear—especially when one considers the vintage of most CGL policies, the latency of the pollution menace, and the relative recentness of most pollution claims.[4]

---

**4.** A logical corollary of the proposition that the more individual responsibility imposed, the

more careful one's behavior becomes—resulting in the societal good of less pollution—would be

I concede that there is currently a trend to find no duty to defend where the pollution at issue can be said to be *clearly* not sudden and accidental. These cases rely in part on the fact that the pollution at issue arises out of the insured's ongoing business activity. *See e.g., Great Lakes, supra.* In *Great Lakes*, the First Circuit found that when the policy was read against the allegations in the complaint those allegations unambiguously fell within the pollution exclusion clause. Accordingly, it held that there was no duty to defend. The court noted that the soil and water contamination took place as a concomitant of the plaintiff's regular business activity —(reconditioning barrels containing hazardous material) and concluded that no "occurrence" had taken place.

The First Circuit also emphasized that there were no allegations of a sudden and accidental discharge. *Id.* at 33, 34. Moreover, it is apparent from my reading of those sections of the complaint reproduced in *Great Lakes*, that the plaintiff polluters discharged, continuously, without permit, wastes directly onto the ground and into a nearby stream. The court concluded:

> In light of the allegations of the complaint, the words of the policy, and the type of activity in which Great Lakes was engaged, we do not think that "a more than casual reading of the policy" by "an ordinary intelligent insured" could result in a reasonable expectation that National Union had a duty to defend Great Lakes.

727 F.2d at 34. I do not read *Great Lakes* to stand for the proposition that whenever one's ongoing business involves in some way hazardous wastes that there is a mandatory presumption that no instance of pollution can be "sudden and accidental" or unexpected or unintended. Here, of course, the *Adkins* complaint expressly alleges that the release(s) *were* sudden and accidental. Moreover, I have indicated that there have been numerous arguments raised indicating that there are material facts in dispute with respect to whether the pollution was caused by a release or releases that can be said to be "sudden and accidental."

Similarly, in *American States, supra,* a case upon which St. Paul also relies, the court held that given "the continuous nature of alleged dumping ... and the absence of any suggestion that it was accidental," there was no duty to defend or indemnify. *American States,* 587 F.Supp. at 1553. Although the complaint was drafted in general terms and never expressly alleged that dumping was a regular part of the polluter's business, the court found it significant that there was no suggestion that the dumping was "unintended, unexpected, sudden or by accident." *Id.* at 1553. Put differently, the court concluded that all of the allegations in the four complaints suggested that the release of toxic materials was continuous and not in any way sudden or accidental, and for that reason they did not even arguably state an "occurrence" within the meaning of the policy. *Id.*

that maximum benefits could be achieved by doing away with the exception to the pollution exclusion altogether. Abolishing the pollution exclusion would, apparently, force those who handle toxics and hazardous wastes to bear full liabilities for any pollution that results from their activities. The wisdom and economic efficiency of that proposition has recently been challenged.

> In the effort to impose on waste-handling firms the full costs of the risk they generate, a regime of full insurance with premiums tailored tightly to risks is preferable to a regime of no insurance with firms directly bearing all liabilities. The insurance industry is expert in collecting and evaluating risk data, identifying methods of risk reduction, and charging premiums that reflect broad risk experience.

> (citation omitted). Individual firms lack such expertise, and society would pay large transaction costs if each firm had to determine the proper price of every risk it incurred. In addition, large insurance pools provide for the compensation of tort victims and the funding of cleanup agencies, whereas individual firms are often overwhelmed by their waste-releated liabilities. (citation omitted). For arguments challenging the notion that insurance premiums can force firms to internalize costs, *see* Kunzman, *The Insurer as Surrogate Regulator of the Hazardous Waste Industry: Solution or Pervesion?,* 20 Forum 469, 481–88 (1985).

*Developments in the Law, Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1578–79 n. 40 (1986).

To the extent that *American States* turns on a temporal reading of the term "sudden," I simply disagree for the reasons previously given. In addition, there are express and specific allegations in the *Adkins* complaint that the releases, that is, the occurrences *were* "sudden and accidental." Moreover, *American States* did not involve allegations concerning multiple defendants and the correlative problems of determining causality given the overlap of possibly "intentional" as well as unintentional occurrences. *American States* clearly involved a claim for property damage which was caused by the "insured's regular business practice of illegally dumping toxic wastes." *Fireman's Fund,* 662 F.Supp. at 76 n. 8 (characterizing the holding in *American States*).

I admit that both in the definition of the triggering term "occurrence" as well as in the terms comprising the exception to the pollution exclusion there is a clear indication that an active polluter should not be permitted to benefit from his or her continued wrongdoing by spreading the risks of loss via insurance. *Cf. Niagara County v. Utica Mut. Ins. Co.,* 103 Misc.2d 814, 427 N.Y.S.2d 171, 174 (Sup.Ct.1980) (noting that statutorily mandated pollution exclusion was intended solely to deprive active polluters of coverage), *aff'd* 80 A.D.2d 415, 439 N.Y.S.2d 538 (1981). Put differently, courts rightfully ask whether the incident at issue was "accidental" or "intentional." The corollary to this inquiry is that an unintentional release must be accidental and hence would be covered. *Cf. All State Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 488–89, 426 N.Y.S.2d 603, 604–605 (1980).

Commentators have correctly observed that "[t]he standard for showing intent has ... become quite high. The insurer must show that the insured intended to dispose of the waste *and to have the disposal result in an improper release.* The rule now appears to be that coverage will be denied only if the damage resulting from the particular course of action of the insured could have been foreseen with a high degree of certainty." *Developments in the Law, Toxic Waste Litigation,* 99 Harv. L.Rev. 1458, 1583 (1986) (emphasis added).

*Cf. Fireman's Fund,* 662 F.Supp. at 76 n. 8 (discussing *American States* and noting that "[a]n occurrence policy containing a pollution exclusion covers property damage caused by pollution only if both the property damage and the release of pollutants is unexpected and unintended.").

In sum, I find that none of the CGL insurers at this point has been able to demonstrate that the underlying claims in the *Adkins* complaint are totally outside the scope of their policies' coverage. Put differently, the defendants may not deny a defense because they have not been able to establish that the allegations in the complaint fall within the pollution exclusion, nor have they been able to demonstrate that there has been no "occurrence." It is clear that the underlying claims involve allegations of continuous injury. This fact does not disturb my analysis. I am unpersuaded that under the complex and unique facts of this multi-party case that *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir.1986) is dispositive with respect to the duty to defend.

*Mraz* was a waste burial case which dealt with contamination which seeped from a supposedly "leakproof" pit. The Fourth Circuit held that because setting the time of actual leakage of contaminants from the pit was almost impossible to determine, the "occurrence" should be judged by the time at which the leakage and damage are first discovered. Significantly, *Mraz* involved a CERCLA action brought by the state (Maryland) and federal governments to recover costs of removing hazardous wastes. The question of property damage was the only issue before the court in *Mraz.* Even assuming, *arguendo,* that the "first discovery of actual damage rule" is applicable here, the complaints are ambiguous as to that date—and suggest 1981 or 1980 or perhaps an earlier date of "first" discovery.

Moreover, the *Allen* and *Adkins* complaints also contain allegations of [continuous] bodily injury as well as property damage. It is clear to me that with respect to the bodily injuries the allegations—albeit somewhat inartfully drawn—may be read

to suggest coverage for a progressive disease (cancer, etc.) so that a different theory of "occurrence" than that of "first discovery" may well be appropriate for the bodily injury claims. *See e.g., National Standard Insurance Co. v. Continental Insurance Co.*, CA–3–81–1015–D (N.D.Tex. Oct. 4, 1983) (in context of bodily injury claims arising out of exposure to chemical carcinogens, court found that all insurers on the risk between the initial exposure and the time of manifestation are obligated to defend). *Cf. Insurance Company of North America v. Forty–Eight Insulations, Inc.*, 451 F.Supp. 1230 (E.D.Mich. 1978) (discussing in some detail the problems of cumulative tort cases in a case of first impression involving products liability claim based on asbestos exposure). Although the court in *Forty–Eight* adopted an "exposure" theory as opposed to a manifestation theory, it is clear from the opinion that the court found "bodily injury" and "occurrence" inherently ambiguous in the progressive disease context. Moreover, the court settled on the exposure theory because *under the facts before it*, it concluded that the relevant state courts (Illinois and New Jersey) would strictly construe contract language in favor of the injured and to promote coverage. *Id.* at 1231 and 1232.

Although the *Mraz* first manifestation approach is one of a number of possible theories through which the facts of this case could be—and may ultimately be—filtered, at this point I believe that I do not have to and should not confine myself to one theory of occurrence in order to find that these insurance companies have a duty to defend—at least with respect to the *Allen* and *Adkins* complaints which allege both [continuous] bodily injury and property damage. Further, in *Independent Petrochem. Corp. v. Aetna Cas. & Sur.*, 654 F.Supp. 1334, 1345 (D.D.C.1986), the court noted that "[p]rior to determining which trigger mechanism to use, a court can still find that a defendant insurance company is liable to provide a defense. *Emons Indus., Inc., v. Liberty Mut. Fire Ins. Co.*, 481 F.Supp. 1022 (S.D.N.Y.1979)."

As the parties themselves have already recognized, because the settling of the "occurrence" issue has implications on the question of indemnification and because a finding by this Court could effect the state court actions which are still pending (*Allen* and *Adkins*), I find yet another reason to refrain from fixing a single occurrence theory at this time. I simply find "no reason why the insured, whose insurer is obligated by contract to defend him, should have to try the facts in a suit against his insurer in order to obtain a defense." *Independent Petrochem.*, 654 F.Supp. at 1346.

In this regard I note that I am not persuaded that I ought to adopt the specific occurrence theory set forth in *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379 (6th Cir. 1984) (applying the so-called "cause test" the court held that under Illinois law the number of occurrences was determined by the number of causes of injury rather than by the number of injuries). (The "effect test," on the other hand, holds that it is the number of injuries rather than the [continuous] proximate cause which determines the number of occurrences. *See Elston–Richards Storage Co. v. Indemnity Insurance Co.*, 194 F.Supp. 673 (W.D.Mich.1960) (applying effect test and finding a number of occurrences of property damage within policy period)).

Further, it does not appear that the factual or procedural contexts set forth in *Michigan Chemical* are properly analogous. In *Michigan Chemical*, hundreds of claims were brought against Michigan Chemical by farmers who had sustained property damage which resulted from the distribution of contaminated livestock feed. It was clear that damage from exposure to the toxic substance occurred during a two-year period. Moreover, there was evidence that the cause of the damage was but a single misshipment of the contaminant. Under those facts, the Sixth Circuit noted that "the general rule is that an occurrence is determined by the cause or causes of the resulting injury ... and ask[ed] if there was but one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages." However, even

applying the "cause test" set forth in *Michigan Chemical*, I believe that the unique facts of this case place it outside the general rule spelled out there.

Moreover, there have been very few cases which have had occasion to address the multiple occurrence issue in the hazardous waste context. Again, here the complaint indicates that the claims for [continuous] bodily injury as well as the property damage claims could have been caused by a multitude of causes (different contaminants) as well as by a number of different defendants for different periods of time. *Cf. Township of Jackson v. American Home*, No. L–29236–8 (Super.Ct.Law Div. 1984) (applying a hybrid "cause and effect" test in the context of personal injury claims allegedly resulting from exposure to different contaminants in a toxic waste site. The court noted that a variety of injuries could have been caused by different defendants and by different contaminants for different periods of time. *American Home* is cited in *Delayed Manifestation Personal Injury and Property Damages Cases: CGL: Insurance Coverage Issues*, 320 PLI/LIT 119 available on WestLaw, NTP Library).

Although plaintiff has analyzed the duty to defend issue under at least four different theories which courts have currently fashioned concerning what constitutes an "occurrence," what is clear is that the common denominator of these decisions is that courts have consistently chosen and/or fashioned a theory to maximize coverage. There is no reason why some variation of the "continuous trigger" theory should not be seen as applicable here—at least at this juncture where the facts are quite complex and the issue of precisely when the so-called "continuous occurrences" should be "fixed" is so hotly disputed. Such a "hybrid" continuous trigger theory would clearly require all the insurers to defend where the date upon which the "continuous" damage first occurred has not been settled and/or where continuing exposure (damage) is also alleged. Under such a theory every policy in effect at any time during the (continuous) injury process— from the initial exposure(s) until the last manifest development of bodily injury or property damaged would be triggered for coverage.

I have found that the *Adkins* complaint states claims, which *qua* claims, comprehend injuries potentially within the coverage of these CGL policies despite the fact that each policy protected the insured for different periods of time. Different interpretations of "occurrences" and different theories of bodily injury and property damage may, of course, ultimately determine a different outcome with respect to the duty to indemnify. But as I have emphasized, the duty to defend extends beyond the duty to indemnify. Where, as here, the underlying complaints allege continuing releases and continuing injuries and damages, an occurrence has been satisfactorily alleged during all the GCL insurers' policy periods with respect to the *Adkins* complaint. Before extending my analysis to the remaining complaints, I must first address Northbrook's choice of laws argument.

*Northbrook's Choice of Law Argument*

■ Northbrook argues and plaintiff agrees that because the Northbrook policy was issued and countersigned in Illinois that the substantive law of the State of Illinois governs. USF & G argues that because the law among the states is essentially the same with respect to the duty to defend, it is of little significance which state's law is chosen as controlling for a given insurance contract. *See e.g., Smith v. Pierpont*, 123 Mich.App. 33, 35, 333 N.W.2d 165 (1983) and *Severine v. Ford Aerospace*, 118 Mich.App. 769, 771, 325 N.W.2d 572 (1982). USF & G argues further that Northbrook would not be able to demonstrate that construing the policy under Illinois law with respect to the duty to defend would lead to a different result as the law on that issue is the same in Michigan as it is in Illinois—as indeed it is in most other states. *Cf. e.g., Elas v. State Farm*, 39 Ill.App.3d 944, 352 N.E.2d 60 (1976); *see also, Thornton v. Paul*, 74 Ill. 2d 132, 223 Ill.Dec. 541, 384 N.E.2d 335 (1979).

Northbrook argues that several issues in this case have not been decided by the

Illinois courts and that I will have "to attempt to determine what Illinois law would be on these issues were they to be decided by the Illinois State Supreme Court." Northbrook's Brief in Opposition at 8. Northbrook further argues that an Illinois court deciding this issue would not follow Michigan law but would look to the law of other states where a large number of insurance companies are headquartered. Northbrook then cites a Pennsylvania case, *Fischer & Porter Co. v. Liberty Mutual Ins. Co.*, 656 F.Supp. 132 (E.D.Pa.1986) which indicates that while an insurer has the burden of proving a defense or an exception to coverage, the insurer would not have the burden of proving both coverage and the defense. Northbrook also cites a New Jersey decision, *CPS Chemical Co., Inc. v. Continental Ins. Co.*, 203 NJ Super 15, 495 A.2d 886, 889 (1985) (denying summary judgment for plaintiff where there was a question of intentionality of plaintiff's conduct and holding that insurer's obligation to defend did not require insurer to defend a claim while it contested issue of coverage).

Although it is self-evident why Northbrook singled out these particular decisions from other jurisdictions, I am not persuaded in the first instance that Illinois would follow the law of these states or, for that matter, these particular decisions. Moreover, even assuming Illinois would look to these states for guidance, it is by no means clear that their courts would decide the matter now before me to Northbrook's liking. *See e.g., CPS Chemical Company, Inc. v. The Continental Insurance Company and United States Fidelity and Guaranty Company, supra* (1157 of this opinion); *see also Jackson Township, supra* (at 1157–59 of this opinion).

More important, the Sixth Circuit has recently provided guidance concerning the "hierarchy of authority" which a federal court should follow in diversity cases. In *Grantham and Mann v. Amer. Safety,* 831 F.2d 596 (6th Cir.1987), the Sixth Circuit said:

> In diversity cases, the federal courts must apply law 'in accordance with the then controlling decision of the highest

state court.' *United States v. Anderson County, Tennessee,* 761 F.2d 1169, 1173 (6th Cir.) (*quoting Vandenbark v. Owens–Glass Co.,* 311 U.S. 538, 543 [61 S.Ct. 347, 350, 85 L.Ed. 327] (1941)), *cert. denied,* [474 U.S. 919] 106 S.Ct. 248 [88 L.Ed.2d 256] (1985); *see Erie R.R. V. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938). If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the "majority" rule, what the state's highest court would decided if faced with the issue. *See Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir. 1985) citing cases); *Mathis v. Eli Lilly & Co.,* 719 F.2d 134, 141 n. 15 (6th Cir.1983) (*quoting Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981)). Nevertheless, although a decision by a lower court is not controlling where the highest state court has not spoken, *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 [87 S.Ct. 1776, 1782, 18 L.Ed.2d 886] (1967); *see Bailey,* 770 F.2d at 604, *the decision of 'an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' Estate of Bosch,* 387 U.S. at 465 [87 S.Ct. at 1776] (*quoting West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237 [61 S.Ct. 179, 183, 85 L.Ed. 139] (1940)) (emphasis supplied by *Bosch*); *see also Woodruff v. Tomlin,* 616 F.2d 924, 928–29 (6th Cir.) *cert. denied,* 449 U.S. 888 [101 S.Ct. 246, 66 L.Ed.2d 114] (1980).

*Grantham,* 831 F.2d at 608–609.

Following *Grantham,* I believe that I should first look at what the intermediate Illinois state court has decided with respect to the pollution exclusion clause issue. Moreover, the Illinois Supreme Court also provided guidance with respect to the duty to defend. *Reliance Ins. Co. of Illinois v.*

*Martin,* 126 Ill.App.3d 94, 81 Ill.Dec. 587, 467 N.E.2d 287 (1984) concerned the issue of whether a parking garage permitted carbon monoxide and soot to regularly escape into a nearby condominium unit. The insurer sought a declaratory judgment concerning its duty to defend or indemnify pursuant to the pollution exclusion clause in its comprehensive general liability policy. The appellate court reversed the trial court's ruling in favor of the insurer and held that there was a material fact concerning whether the soot and fumes were "sudden and accidental" within the meaning of the pollution exclusion.

*Reliance* noted that:

[a]n insurer must defend a claim where any of the allegations of the complaint fall within, or potentially within, the coverage provided. *Maryland Casualty Co. v. Peppers,* 64 Ill.2d 187, 355 N.E.2d 24, 27 (1976). Where the terms of an insurance policy are ambiguous or are subject to more than one reasonable construction, the policy should be construed in favor of the insured and strictly against the insurer. *Willett Truck Leasing Co. v. Liberty Mutual Insurance Co.,* 88 Ill.App.3d 133, 43 Ill.Dec. 376, 410 N.E.2d 376 (1980) (other citations omitted).

I note that this analysis appears quite similar to that supplied by Michigan law. *Reliance* concluded that because there was an issue of fact with respect to the question of whether the soot and fumes generated by the company were sudden and accidental, summary judgment was improperly granted to the insurer. *Reliance* noted that the complaint alleged that the fumes and soot entered the condominium "at diverse times and over a period of time." *Id.* at 289. The insurer argued that these assertions precluded any question as to whether the entrance of the fumes was sudden and accidental. Noting that Illinois courts had not addressed this precise issue, the appellate court went on to conclude that the relevant question was "not the time frame involved but whether the insured could have intended or expected carbon monoxide and soot to enter the ... condominium unit." *Id.* The *Reliance*

court based its analysis on a broad reading of "accidental" as provided in a New York appellate court decision, *Allstate Insurance Co. v. Klock Oil Co.,* 426 N.Y.S.2d 603, 73 A.D.2d 486 (1980). *Klock* interpreted a pollution exclusion clause identical to that at issue in *Reliance*—and in this case. I, of course, have also relied in part upon the *Klock* analysis. (*See* this opinion at 1161).

In sum, I am not persuaded that the Illinois courts would diverge from Michigan law upon the points which are critical to this decision. Consequently, I reject defendant Northbrook's argument that it should not be required to defend the Thomas defendants on the basis that facts might theoretically be shown which would bring the claims in question within NESCO's coverage, [but] "[r]ather ... should be required to reimburse its insureds and USF & G for the costs of defense if, and only if, facts are established which bring the claim within NESCO's coverage." Northbrook's Brief at 10. Finally, *Reliance* noted that "[t]he rule in Illinois appears to be well established that in cases of doubt as to coverage, an insurer has an obligation to the insured either to defend under a reservation of the right to deny coverage at a later date, or to seek a declaratory judgment as to its obligation. *Thornton v. Paul,* 74 Ill.2d 132, 23 Ill.Dec. 541, 384 N.E.2d 335." (other citations omitted).

*The Allen Complaint*

■ It is true that the *Allen* complaint is not as artfully drafted as is the *Adkins* complaint. Again, the leading Michigan case on the duty to defend, *Detroit Edison Company, supra,* 102 Mich.App. at 141–142, 301 N.W.2d 832, noted that "the duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Company v. Maryland Casualty Company,* 73 Mich.App. 62, 250 N.W.2d 541 (1976)."

In *Shepard Marine*, the Michigan Court of Appeals noted:

Cases which seem to hold that the duty to defend depends on the allegations, (citations omitted), are essentially upholding another general principal, that the duty to defend encompasses even frivolous and unfounded allegations if, as in the case at bar, a policy clause so provides. This principal cannot be reversed, however, to make the insurer's duty to defend depend upon the skill and pleading of a third party. As the California Supreme Court has stated:

Defendant cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable.

. . . .

To restrict the defense obligation of the insurer to the precise language of the pleadings would not only ignore the thrust of the cases but would create an anomaly for the insured.

73 Mich.App. at 64–5, 250 N.W.2d 541.

In *Travelers Indemnity Company v. Dingwell*, 414 A.2d 220 (1980), the Supreme Court of Maine observed:

'[a] defendant [to an underlying action] has no power to amend a complaint which contains an incomplete statement of facts. Whether he can obtain a defense from his insurer must depend not on caprice of the plaintiff's draftsmanship, nor the limits of his knowledge, but on a potential shown in the complaint that the facts ultimately proved may come within the coverage.'

The dominant rule in other jurisdiction is that the insured has a right to a defense whenever the allegations show a potential that liability will be established within the insurance coverage, even when the allegations are broad and uncertain as to specific facts. (citations omitted).

414 A.2d at 226.

Many of the allegations in the *Allen* complaint mirror those of the *Adkins* complaint. Paragraph 28 of the *Allen* complaint alleges:

"The defendants knew, or in the exercise of reasonable care should have known that dangerous toxic chemicals and industrial waste generated, produced, used, handled, shipped, transported, transferred, hauled, stored, sold and/or disposed of by Defendants were permitted to seep, leak, drain, pour or otherwise enter the earth and soils in and about the property surrounding the THOMAS SOLVENT COMPANY and allowed to enter water, drains, ditches, and other conduits and to filtrate, percolate and migrate into the wells, water, homes, and environments occupied by plaintiffs."

Paragraph 32 alleges in part:

"... the defendants negligently, carelessly, willfully, wantonly, recklessly and improperly engaged in the generating, producing, using, handling, shipping, transporting, transferring, hauling, storing, selling and/or disposing of said dangerous, toxic chemicals and industrial waste ... and the defendants allowed or caused said chemicals to seep, leak, drain, and pour onto and into the ground and into the well systems of the surrounding area and into the land and property of the plaintiffs."

Paragraphs 28 and 32 mirror paragraphs 122 and 128 of the *Adkins* complaint, respectively. Although the *Adkins* complaint *expressly* alleges that the occurrences were sudden and accidental, given the policy considerations concerning the broad reading of the duty to defend set forth in *Shephard Marine, Detroit Edison*, and *Dingwell*, I do not believe that those omissions are fatal in this instance.

Moreover, defendants make no specific objections with respect to the *Allen* complaint that were not also made in the *Adkins* complaint. Accordingly, I adopt my analysis and conclusions concerning "occurrences" and the exclusion clause and find that there is a duty to defend the *Allen* complaint on the part of all of the CGL insurers.

*The Kelley Complaint*

■ For the sake of brevity, I will, in the main, not repeat in full the allegations

in the remaining three complaints, but rather merely cite to them to the extent that it is appropriate.

Paragraph 41 alleges that:

"large quantities of various organic compounds, both 'new' solvents ... and used or 'recoverable' solvent wastes awaiting recycling or disposal have, for more than twelve years, been stored and handled without secondary containment over and near unprotected permeable soils at Defendant's facilities."

Paragraph 67 of the *Kelley* complaint alleges:

"Since January 11, 1982, DNR staff·have repeatedly directed Defendant to: remove contaminated soils, install adequate secondary containment, implement an approved Pollution Incident Prevention Plan, as required by law, and conduct hydrogeological and soil testing needed to determine the full extent of soil and groundwater contamination at each of its facilities. Despite those requests,· and clear evidence that Defendant has contaminated, and continues to contaminate soil and vital groundwater resources with toxic organic chemicals, Defendant has refused to firmly commit to, let alone take, adequate remedial and preventive measures."

At first blush the allegations in the *Kelley* complaint appear to differ significantly from those in the *Adkins* and *Allen* complaints in one respect. The *Adkins* complaint expressly alleged continuous occurrences which were "sudden and accidental" —the *Allen* complaint implied as much. On the other hand, the *Kelley* complaint alleges via paragraph 67 that the *"defendant has refused to firmly commit to, let alone take, adequate remedial and preventive measures at least since January 11, 1982 when the complaint alleges that the DNR staff repeatedly directed defendant to take action."* (emphasis added).

I emphasize that in the so-called "comparison test" the allegations of the complaint are lined up side-by-side with the provisions in the policy. It appears at first blush that the complaint itself indicates that there is no duty to defend after January 11, 1982. It appears that unlike the *Adkins* and the *Allen* complaints, the *Kelley* complaint makes specific allegations with respect to specific dates as to the failure of defendant to take certain actions when directed to do so by the DNR. (It is true that in the *Adkins* complaint there are two paragraphs which allege certain dates concerning the denial of defendant's license application by the DNR [see ¶¶ 86–87], but these paragraphs are informational and are arguably qualitatively different than that of paragraph 67 set forth above. Moreover, I have previously described and analyzed in detail the allegations contained in the *Adkins* complaint.)

The question here is whether after January 11, 1982 the complaint so unequivocally asserts that the defendant "constructively intended" the damages which flowed from his conduct—because those damages were so readily foreseeable from his refusal to respond to the DNR directives—that the insurer has no duty to defend.

Put differently, the narrow question is: Should any insurer on board after January 11, 1982, be expected to defend on the basis of the allegations contained in the *Kelley* complaint? Again, this inquiry should be made using the comparison test without any judgment being made as to whether the underlying claims are meritorious.

I note that it is not easy to articulate the standard which requires a court to find that the conduct was "constructively intentional." One of the best known commentators in this area has suggested that the difference between unintended damages and damages which can be considered "constructively intended" is best expressed as the less than unequivocal distinction between highly expectable losses and losses that are less expectable. *See* R. Keeton, Basic Text on Insurance Law (1971), note 51, at 299. Although the *Kelley* complaint alleges continuing occurrences, it appears that it alleges that losses after January 11, 1982 could only be considered highly expectable.

Paragraph 66 indicates that "defendant continues to store and handle at both of its facilities many of the same types of organ-

ic chemicals which it previously spilled, leaked or otherwise discharged into the soil...." However, both paragraph 11 and paragraph 12 clearly indicate that the defendant submitted a proposed "Pollution Incident Prevention Plan (PIPP) in 1982. Thus from the insured's perspective it cannot be said that it failed to take any measures, but perhaps that the submitted plan and measures were considered inadequate. Considering the broad reading given to the duty to defend under Michigan law, I cannot say at this point—without the ascertainment of material facts which are in dispute and which are beyond the complaint—that the injuries caused by the alleged pollution were actually intended or "constructively intentional."

Accordingly, I find that all of the CGL policyholders have a duty to defend the *Kelley* complaint. Defendants raise an additional issue concerning whether the complaint actually seeks equitable relief rather than property damages. Because the resolution of that argument also affects the CERCLA claims, I will address it in the next section.

*The CERCLA Claims*

■ Both CERCLA claims involve the related issue of whether the complaints allege [property] "damages" within the meaning of the policies.

Paragraph 1 of the *United State*'s complaint alleges, in part:

> "The United States seek reimbursement of costs incurred and to be incurred in responding to the releases and threatened releases of hazardous substances into the environment from facilities owned and operated by defendant, in the vicinity of the Verona Well Field in Battle Creek, Michigan."

Defendant argues that claims by the EPA for remedial and response costs are not covered by the standard CGL policy language as claims for "damages." *Cf. Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1329 (4th Cir.1986); *Maryland Casualty Co. v. Armco, Inc.*, 643 F.Supp. 430, 435 (D.Md.1986).

In *Maryland Casualty,* the court found that "black letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts." 643 F.Supp. at 432. The court went on to hold that claims for Superfund (CERCLA) clean-up costs could not be considered equitable for seventh amendment purposes—as indeed all courts ruling on that discrete issue have held—and essentially monetary for purposes of interpreting an insurance contract. *Id.* at 430. *Maryland Casualty* concluded that insurance contracts "drew the line at the historic division between law and equity ... arbitrary as it may appear ..." and found in favor of the insurer.

*Maryland Casualty* rejected the recommendation of the special master who suggested—in my view—a more reasonable view of property damage from the standpoint of the insured. It is clear to me that once property damage is found as a result of environmental contamination, clean-up costs should be recoverable as sums that the insured was liable to pay as a result of property damage. In this context the argument concerning the historical separation of damages and equity is not convincing and it seems to me that the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties. While such claims might be characterized as seeking "equitable relief," the cleanup costs are essentially compensatory damages for injury to common property and for that reason the insurer has a duty to defend. *Cf. United States Aviex Company v. Travelers Insurance Company,* 125 Mich.App. 579, 336 N.W.2d 838 (1983). The short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.

Plaintiff also argues that even conceding that there is a split in legal authority on this issue, in the absence of higher Michigan authority, I ought to follow the Michi-

gan Court of Appeals decision in *Aviex.* Compare, e.g., *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188 (9th Cir.1986) and *Continental Ins. v. N.E. Pharm. & Chem. Co.,* 811 F.2d 1180 (8th Cir.1987), *reh. granted sub nom. Continental Ins. v. State of Mo.,* 815 F.2d 51 (8th Cir.1987) (finding duty to defend) with *Mraz v. Canadian, supra* and *Maryland Casualty, supra* (finding no duty to defend because the government's complaint failed to assert claims for property damages within the meaning of the policies).

Following the paradigm of authority set forth in *Grantham* and emphasizing that I fail to find persuasive case law to the contrary, I am convinced that the Michigan highest court would adopt, if not expand upon, the definition of "damages" set forth in *Aviex* with respect to an insurer's duty to defend a cleanup action. Although, I realize that the *Aviex* decision is more directly "persuasive" with respect to the *Kelley* complaint, I nonetheless find the arguments set forth in *Aviex* persuasive and applicable in the CERCLA context. For all these reasons, it is worth examining the holding in *Aviex* in more detail.

In *Aviex,* the Michigan Department of Natural Resources attempted to compel U.S. Aviex to undertake an investigation and remedy groundwater contamination which occurred after a fire was put out at its chemical manufacturing plant. Water had been used to put out the fire, and toxic chemicals had subsequently migrated into groundwater located on Aviex's property and then spread beyond its property. The Michigan Attorney General filed suit as well.

The issue of the duty to defend was before the *Aviex* court. Michigan Court of Appeals said:

> Defendant also questions the trial court's ruling that defendant is 'obligated to defend any claim or action, and to pay for any costs of (plaintiff) for correcting chemical contamination, imposed by or resulting from a determination by a tribunal of competent jurisdiction.' Defendant argues that this ruling incorrectly construes the insurance agreement to cover sums of money expended by plaintiff in response to equitable or injunctive orders, instead of covering only money paid or ordered to be paid as *compensation* for injury or loss.

125 Mich.App. at 587–588, 336 N.W.2d 838. (original emphasis).

The court then examined the policy which contained virtually the same language as before me. The court said:

> The contract between defendant and plaintiff obligates defendant to 'defend any suit against (plaintiff) seeking damages' and to pay 'all sums which (plaintiff) shall become obligated to pay by reason of liability imposed by law upon (plaintiff) ... as damages because of ... property damage.' Thus, both the obligation to defend and the obligation to pay depend on the definition of 'damages.' As stated earlier, defendant interprets 'damages' as compensation for injury or loss, and argues that costs incurred by plaintiff in complying with equitable or injunctive orders are non-compensatory. Plaintiff and intervenor interpret 'damages' as sums which the insured is obligated to pay by reason of liability imposed upon him by law (in this case, MCL 323.6, MSA 3.526 and MCL 323.10; MSA 3.529(1)).

*Id.* at 588, 336 N.W.2d 838.

The court concluded:

> In our opinion, this reasoning interprets 'damages' too narrowly. Under MCL 323.10; MSA 3.529(1), the Attorney General is empowered to file a suit 'to recover the full value of the injuries done to the natural resources of the state....' This language clearly indicates the state's interest in its natural resources. Defendant agrees that the contamination of subterranean and percolating water as a result of the fire is 'physical injury to tangible property' within the terms of the insurance policy. If the state were to sue in court to recover in traditional 'damages,' including the state's costs incurred in cleaning up the contamination, for the injury to the ground water, defendant's obligation to defend against the lawsuit and to pay damages would be

clear. *It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs* ... We therefore affirm the trial court. Defendant must defend and indemnify plaintiff against such claims and costs under the insurance policy.

125 Mich.App. at 589–590, 336 N.W.2d 838. (emphasis added).

The *Kelley* action, injunctive in form, clearly seeks compensation for damages to common property. In its prayer for relief, plaintiffs sought an order *"directing defendant to pay damages ... to compensate ... for Defendant's pollution, impairment and destruction of the environment* caused by the discharge of hazardous chemical toxicants from Defendant's property onto the soils and into the ground water of this state." *Kelley* Complaint, Ex. H at ¶ D, attached to USF & G's Motion and Brief for Summary Judgment (emphasis added). Moreover, as I have previously indicated, I find the *Maryland Casualty* contractual analysis hypertechnical from the insured's standpoint and ultimately unpersuasive.

A very recent decision, *New Castle County v. Hartford Accident and Indemnity Company*, 673 F.Supp. 1359 (D.Del. 1987) (available November 3, 1987 on WESTLAW, Westlaw Legal Bulletin [WLB] database) provides support for my analysis and conclusions.[5] The *New Castle* court rejected a legal, technical reading of "damages" relied upon by *Maryland Casualty* and adopted a dictionary definition of damages. The Court specifically rejected the reasoning in *Mraz* and found that the policy definition of damages included

claims for injunctive relief as well as statutory response costs (CERCLA claims) or costs resulting from other remedial actions. Moreover, the court cited with approval *Aviex* and *Ex–Cello–Corp*. Significantly, the court found the policy language ambiguous and interpreted the language so as to adhere to the reasonable expectations of the insured.

*The State (CERCLA) Claim—Kelley, et al. v. Thomas Solvent, et al., No. K86–164.*

Paragraph 2 of the State of Michigan's complaint alleges in part:

"Plaintiffs seek a judgment requiring the defendant to compensate the State of Michigan for its costs in responding to the pollution emanating from the sites; *for damages to the natural resources* at the State of Michigan; and for statutory penalties." (emphasis added).

■ Again, to the extent that it is necessary, I adopt my previous analysis concerning the pollution exclusion clause and "occurrences." In this regard, I specifically note that under the majority view "property damage," within the meaning of a CGL policy, occurs when the toxic material is disposed of, and it is clear that the complaints allege that these "occurrences" *may* well have taken place during the time when the earliest of the relevant insurers (USF & G) was supplying coverage. Put differently, the complaints allege that the toxic releases at issue were emanating from Thomas Solvent's facilities on a *"continuing basis"* for a period of time extending back more than twelve years prior to the filing of the complaints. Thus an insurer during any of these "exposure times" may be held liable for cleanup costs incurred after an "earlier" policy may have expired. Again, although the final fixing of precise "occurrence dates" [in "fact"]

---

**5.** *New Castle County* is interesting for another reason. It demonstrates that insurers can and do know how to write "unambiguous" insurance policies in the pollution context—even as early as 1975. The *New Castle County* court indicated that the insurance company involved issued three different policies with three significantly different pollution clauses. The policy which was in effect from May 11, 1973 to July 1, 1975 contained essentially the same language as the

CGL policies here. In addition, there was a policy from July 1, 1975 to July 1, 1976 which excluded coverage for all pollution related incidents. Finally, a policy issued from July 1, 1976 to July 1, 1978 stated that "pollution was not covered 'whether or not such discharge, dispersal, release or escape is sudden and accidental.'" *See New Castle County, supra,* 673 F.Supp. at 1364.

properly awaits proof at the underlying trials, I find that in light of the broad duty to defend previously discussed, I must hold that all of the CGL insurers have a duty to defend both CERCLA actions.

### The Automobile Policies

■ I have previously set forth the general provisions of the automobile policies. Although these policies use the word "accident" rather than "occurrence," accident is defined as including continuous or repeated exposure to the same conditions resulting in bodily injury or property damage that the insured neither expected nor intended.

It is clear that the policies require that the discharge be sudden and accidental and that the accident involves a covered auto. Defendant Hartford argues that the alleged discharge(s) are not "sudden and accidental," the complaints do not allege that the accident(s) resulted from the ownership, maintenance or use of a covered auto and that the defendant never advised them of any accidents.

It is clear that the terms "accident" and "occurrence," are, in this context, functionally equivalent. It is also clear that I have previously addressed the arguments set forth by Hartford regarding the pollution exclusion clause and the "occurrence" issue in the CGL context and have provided a thorough analysis and rationale of my position. I simply adopt that analysis and see no reason to repeat it here.

I find that the previously quoted allegations in the *Adkins, Allen* and *Kelley* actions (*see also* ¶ 12 of *Kelley* —"hoses are used to transfer materials between the underground tanks and tank trucks.") all arguably fall within the policy provisions of the automobile policies at issue here. Accordingly, all have a duty to defend with respect to those three actions.

■ Further, both CERCLA complaints indicate as a matter of information and identification that Thomas Solvent transports solvents. However, I can find no allegation in the United States's CERCLA complaint—even reading it very broadly— which indicates that the contamination of the soil or groundwater resulted from the

use, maintenance or operation of any motor vehicle. There is no allegation that any material was improperly transferred, shipped, hauled, or even "handled." Therefore, I find that no automobile insurer has a duty to defend with respect to the United States's CERCLA complaint.

■ This is not the case however with respect to the State of Michigan's CERCLA claim. "Improper handling" (paragraph 1 of the State CERCLA complaint) can be broadly read to refer to and include the shipping, transportation, transferral, and hauling of the toxic chemicals at issue here. Because the allegations in the complaint arguably come within the policy coverage, I find that all the automobile policy insurers have a duty to defend with respect to the State CERCLA claim.

### The "Phantom Policy"—Defendant Continental's Motion for Summary Judgment

■ None of the parties has been able to locate certain policies of insurance which Thomas Solvent alleges were issued by defendant Continental Casualty. Continental concedes that discovery has produced certain generic forms which may have been issued in conjunction with these policies, but argues that these forms are not the complete policies that would have been issued. Continental argues further that it is unknown if Thomas Solvent was the insured on the alleged policies. Further, the location and amounts of coverage, the dates of coverage and whether the policies were even in fact issued, are all unknown.

Defendant concedes that there is some evidence that the billing forms of Thomas Solvent's agent indicate "Continental." However, Continental argues that a review of Best's list of insurance companies identifies a number of "Continental Companies" which are not associated with Continental Casualty Company, including Continental American Life Insurance Company, Continental Insurance, Continental Insurance Company of Canada, Continental Reinsurance Corporation and Continental Western Insurance Company. Moreover, at the

time Continental Casualty Company was using the CL and CCP prefixes, other companies were using the same alpha numeric numbering systems and Continental argues that these numbers may correlate with the policy number of these other companies. In addition, one of the alleged policy numbers, 522142408, is a number which apparently does not relate to any policies which were ever issued by Continental Casualty Company.

Plaintiff USF & G argues that although the deposition of Thomas Lucas, a "records management" employee of Continental, indicates that Continental has not been able to locate any boxes or records associated with the alleged policy years or the alleged type of policy, Mr. Lucas did indicate that Continental retains samples of past standard policy forms. *See* Lucas Deposition at 14–15. Further, Mr. Lucas also indicated that the prefixes to the number supplied by the Worgess Agency—the insurance agency which represented Thomas Solvent during this period of time—that is, "CCP" and "CL," represent Continental's designations for general liability and general auto coverage, respectively. *Id.* at 18–19. Mr. Lucas also indicated that Continental issued those types of policies from 1964 to 1968. *Id.* at 18–19.

Mr. Lucas could not at the time of his deposition testify from his own knowledge that the insurance industry practice in the years 1964 to 1968 was to adopt standard forms such as those promulgated by the Insurance Services Office ("ISO"). However, after the Lucas deposition, Continental produced four groups of standard forms which were taken from its records. USF & G argues that the four policy numbers alleged to reflect Continental Insurance policies coincide with policies which could have been issued by Continental. Plaintiff argues that this conclusion is supported by the "coincidence of the prefix "CL" or "CCP," the policy number and the dates of coverage. *See* USF & G's Supplemental Response to Continental's Motion for Summary Judgment at 5. Put differently, USF & G argues that each of the four alleged policies, the policy prefixes and numbers

are consistent with Continental's practices during the alleged time period.

USF & G argues that it has demonstrated the existence of sufficient extrinsic evidence to support its argument that there were policies issued which "in all likelihood contained the standard language on the duty to defend" and that "at least one of those policies contained a provision establishing a duty to defend the underlying cases." *See* USF & G's supplemental response to Continental's motion for summary judgment at 6 & 8. USF & G concludes that Continental's motion for summary judgment should be denied and USF & G's amended motion for summary judgment should be granted.

Continental argues that even assuming that it is determined that Continental issued a policy of insurance to Thomas Solvent and that as a part of that policy the "generic forms" previously discussed were issued, this Court is nevertheless without sufficient evidence with which to determine that a duty to defend exists. Continental emphasizes that plaintiff has not established the dates of coverage, policy amount, the location of the insured's premises, the name or identity of the insured, the risk and loss insured, the extent of coverage available or any other specifics. *See* Continental Casualty Company's Supplemental Brief in Support of Motion for Summary Judgment at 2.

I find that under these facts, plaintiff USF & G has simply failed to meet its burden to present the existence and/or the details and specifics of coverage in order to allow me to carry out a "comparison" test in order to determine the duty to defend. *See Strong v. Hercules Life Insurance Company,* 284 Mich. 573, 280 N.W. 55 (1938) (noting burden is on plaintiff to produce proof of the existence of the policy). *Accord American Home Assur. Co. v. Evans,* 528 F.Supp. 1276 (E.D.Mich.1984) (citing *Hercules* for the same proposition). Accordingly, I will enter an order granting Continental's motion for summary judgment.

### Allocation of Defense Costs

Plaintiff USF & G argues that until the number and dates of occurrences—if any—are established, each insurer shares equally USF & G's duty to defend. Accordingly, USF & G seeks an order which equally divides responsibility for past and future defense costs among USF & G, Canadian, Northbrook, St. Paul and Hartford.

Northbrook argues that the defense costs should be apportioned among the carriers based on the number of years of coverage afforded by each carrier's policy. Northbrook relies upon *Ins. Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980) *clarified on rehearing*, 657 F.2d 814 (1981), *cert. den.*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). In addition, Northbrook asks for a separate briefing and argument on this issue.

Similarly, defendant St. Paul argues that the defense costs should be prorated, based upon time of risk rather than by the number of primary insurance carriers. St. Paul has submitted a chart indicating the total number of days each insurer was "on the risk." *See* St. Paul's Supplemental Response in Opposition to Plaintiff USF & G's Motion at 4.

*Forty–Eight* concerned bodily injuries resulting from exposure to asbestos. The Sixth Circuit, addressing the bodily injury problem, found that the exposure theory it adopted allowed for a reasonable means of proration and therefore prorated defense costs. The Court noted that "the insurer has not contracted to pay defense costs of occurrences which [take] place outside the policy period." 633 F.2d at 1224–1225.

I believe that it would be inappropriate to adopt the reasoning set forth in *Forty–Eight*. I have made clear that the duty and extent of liability is not capable of precise determination at this time. It is not clear, for example, which theory or theories of "occurrences" will be applied in the various cases now pending in this and other courts and, beyond this, all the companies are at this point potentially liable. *See e.g., Emons Industries Inc. v. Liberty Mut. Fire Ins. Co.*, 481 F.Supp. 1022, 1026 n. 8 (S.D.N.Y.1979) (discussing *Forty–Eight* and refusing to prorate defense costs where both insurance companies at issue stood on "equal footing with respect to potential liability and their concomitant duty to defend.")

Accordingly, I will enter an order indicating that each insurer which I have found to have a duty to defend, must share past and future defense costs equally with USF & G.

### Conclusion

What appeared to be, at first blush, simply a "duty to defend" case, has, upon closer inspection, turned out to be a rather complex case involving numerous legal issues. Unfortunately, the law in this area is unsettled to say the least. Some decisions appear to turn on contractarian principles. Others appear to include public policy concerns of "maximizing coverage." More recently, there is a discernable trend to deny coverage out of an apparent concern for the "liability crisis." Commentators have noted that much of the litigation concerns relatively "old" CGL insurance policies—given the fact that our understanding of the scope of environmental damage caused by toxic wastes and other forms of pollution is a relatively recent phenomenon—and that "new" policies are difficult to secure and the costs, prohibitive. *Developments in the Law, Toxic Waste Litigation*, 99 Harv.L.Rev. 1458, 1576 (1986). Moreover, the stakes have become so high and these issues so frequently litigated that at least *"[o]ne insurance company writes insurance for the cost of litigating against one's own insurance company." Id.,* at 1576 n. 15 (emphasis added). Each year dozens of new law review articles appear on the subject. My review of the mounting case law in this area reveals that there continues to be a "split" in authority within and between circuits.

There are two things that are clear to me at this point. First, I do not think it wise or necessary that so much financial resources are spent trying these duty to defend issues. These and other related issues need to be clarified. Insureds appar-

ently must often seek insurance just to cover the cost of litigating against their own insurance company! The expenditure of such funds by the insured diminishes the amount available to actually clean up the environment and/or reimburse the government or private parties for the costs of cleaning up the environment—assuming liability is found.

What is also evident is that if so-called "environmental insurance" is ever going to be available to businesses on a large-scale basis, the issues raised in this case as well as other legal issues concerning environmental litigation must be clarified so that businesses and local governments which engage in toxic-related enterprises can secure adequate insurance that will permit them to remain solvent and, at the same time, to put in place effective pollution safeguards. On the other hand, until these and other related legal issues are clearly defined, insurance companies will not have enough confidence in their ability to predict risk and, consequently, will continue to sell environmental insurance at premiums which no business or local government can afford to pay. It is obvious that this state of affairs benefits no one. While every case is to some extent fact specific, the standards which are to be applied concerning the issues of "damages" and the pollution exclusion clause, for example, can and should be stabilized.

It is my hope that this analysis—while aimed at resolving the legal issues presented to me by the particular facts of this case—will also help to focus the public policy issues which inform the case law debate on the scope of the duty to defend and, by implication, the duty to indemnify "toxic waste" litigation. I do not believe that this dilemma can be properly resolved by simply reading the pollution exclusion clause so broadly as to preclude claims for continuous occurrences—*especially where, as here, there are specific allegations that the occurrences at issue were sudden and accidental.* Nor is it any help to read actual or constructive intent with respect to environmental damage so broadly as to presumptively preclude any insured in a business related to toxic or hazardous wastes

from coverage. The resolution of the question of whether an insured is an active polluter in most cases awaits factual determinations in the underlying suits. Here, I believe that plaintiff USF & G has properly interpreted its policy provisions and has responded by defending the suits at issue. I have found that the other insurers for the most part have a similar duty. I add that I have, of course, tried to decide these confused and confusing issues as I believe the Michigan Supreme Court would have decided them.

## ON MOTION FOR RECONSIDERATION

Defendant St. Paul, Hartford, and Northbrook have all filed motions for reconsideration, clarification and certification for appeal. Defendant Northbrook simply concurs in St. Paul's motion of January 19, 1988. Defendant Hartford's motion similarly adopts some of the same arguments set forth in St. Paul's brief. On February 8, 1988, plaintiff USF & G responded to those motions for reconsideration and/or clarification.

The Court notes that plaintiff USF & G has provided and/or is currently providing a defense to Thomas Solvent Company, Thermo–Chem, Inc., and Richard E. Thomas. *See* Affidavit of Barry Gee, attached as Exhibit "G" to USF & G's Motion for Summary Judgment. As plaintiff USF & G correctly argues, the Court did not intend for its January 8, 1988 opinion to require a defense to any party except Thomas Solvent Co., Thermo–Chem, Inc., and Richard E. Thomas. Accordingly, the Court agrees with St. Paul that there is no duty to defend Thomas Solvent Company of Detroit, Inc., Thomas Solvent Company of Muskegon, Inc., Thomas Solvent Company of Indiana, Inc., TSC Transportation Company, and Thomas Development Company, Inc. for the reason that claims against those entities are based upon alleged successor liability and/or alleged fraudulent conveyances. Moreover, plaintiff USF & G's motion for summary judgment did not include those entities because it is apparently not providing a defense to those entities.

Defendant St. Paul argues that all of the primary liability carriers for the Thomas entities should share in these defense costs and that while additional liability carriers have recently been identified they have not been made a party to these proceedings contrary to Rule 19 of the Federal Rules of Civil Procedure. Defendant provides no legal argument or case law support for its conclusory statement. Rule 19(a)(1) requires a court to determine whether complete relief can be accorded between those already parties and not as between a party and an absent party whose joinder is sought. As the Court's previous opinions have indicated, USF & G receives the same rights as those of Thomas Solvent. USF & G has simply chosen to sue certain interested parties. The Court notes that declaratory relief may be withheld for nonjoinder of *interested* persons, but given the procedural posture of this case the Court believes that declaratory relief would serve a useful purpose.

■ Further, the Court notes that in the alternative defendant St. Paul has argued that the Court amend its January 8, 1988 order to provide that the amended order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate determination of the litigation pursuant to 28 U.S.C. § 1292(b). Because the Court agrees that its amended order should be certified for interlocutory appeal, defendants will receive the alternative remedy prayed for in their brief. The Court also agrees that Hartford is only an automobile liability insurer and not a general liability insurer and the Court will vacate its earlier order so that the amended order is consistent with the Court's January 8, 1988 opinion.

The Court finds persuasive the argument that the Court should reallocate the cost shares among the carriers so that USF & G, Canadian, Northbrook and St. Paul receive one share as general liability insurers and that Hartford and USF & G allocate one cost share as automobile liability insurers. Accordingly, USF & G would bear two-sixths of the defense costs during post-November 1, 1983 years and the remaining carriers would bear one-sixth of the defense costs.

It is clear from the text of the Court's opinion entered January 8, 1988, that USF & G issued policies from November 1, 1978 through November 17, 1978; Canadian issued policies from November 1, 1978 through November 1, 1981; Northbrook, from November 1, 1981 through November 1, 1983; St. Paul from November 1, 1983 through March 19, 1984; and Hartford from November 1, 1981 through November 1, 1985.

■ The Court finds that the duty to defend arose upon the filing of the respective complaints against one or more of the insureds in the underlying actions. On January 12, 1984, the first action against one or more of the Thomas Solvent insureds which is covered by the policies listed above was filed. *See Kelley, et al. v. Thomas Solvent,* Calhoun County Circuit Court File No. 84–72–CE ("Kelley"). The *Adkins, et al. v. Canadian National Railways, et al.,* Calhoun County Circuit Court File No. 84–3081–CE *("Adkins")* complaint was filed on November 26, 1984; the *Allen, et al. v. Thomas Solvent, et al.,* Calhoun County Circuit Court File No. CA 84–3331 *("Allen")* complaint was filed on August 5, 1985; and the two CERCLA complaints, were filed on May 28, 1986. *See Kelley, et al. v. Thomas Solvent, et al.,* U.S. District Court File No. K86–164 CA8; and *United States v. Thomas Solvent, et al.,* United States District Court No. K86–167 CA8 ("CERCLA actions").

It is clear that all of the primary insurers had policies in effect before the first *"Kelley"* complaint was filed. Further, as plaintiff USF & G points out, "pre-suit" costs are not at issue here. Moreover, while no costs could have been incurred by any party prior to January 12, 1984, USF & G indicates that it seeks reimbursement for legal expenses which it incurred starting on February 6, 1984. *See* affidavit of Barry Gee attached to USF & G's Supplemental Brief Re: Duty to Defend.

**1176**

The Court will also certify its order pursuant to § 1292(b). Although, St. Paul's prayer for relief asks the Court to certify its order pursuant to § 1292(a), it is clear from the body of its brief, that it seeks certification pursuant to 28 U.S.C. § 1292(b).

In considering whether to certify an interlocutory order for appeal, the Court must determine whether: (1) the order involves a controlling question of law; (2) there is a substantial difference of opinion concerning the order; and (3) an immediate appeal would materially advance the ultimate termination of the litigation. 28 U.S. C. § 1292(b); *Kennard v. United Parcel Service, Inc.*, 531 F.Supp. 1139, 1148–49 (E.D.Mich.1982); *Berry v. School District of City of Benton Harbor*, 467 F.Supp. 721, 727 (W.D.Mich.1978); 16 Wright & Miller, *Federal Practice and Procedure* § 3930 at 156, 166–67 (1977). As the Court noted in *Berry*, section 1292(b) is " 'to be used only in extraordinary cases where the decision of an interlocutory appeal might avoid protracted and expensive litigation. It was not intended merely to provide review of difficult rulings in hard cases.' " *Berry*, 467 F.Supp. at 727 (*quoting, United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir.1966)).

Courts have long recognized that the controlling issue in a request for certification is whether the subsequent appeal would "appreciably shorten the time, effort and expense exhausted between the filing of a lawsuit and its termination." *Berry*, at 727; 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure*, § 3930 at 163; J. Moore, J. Lucas, T. Currier, *Moore's Federal Practice*, § 110.22[22], and cases cited. As the court recognized in *Kennard*, certification loses much of its appeal when it is probable that a reversal of the district court would dispose of the case in its entirety rather than result in a lengthy retrial. *Kennard*, 531 F.Supp. at 1149. To this end, courts often speak of avoiding "piecemeal appeals" by allowing appeal only after a final order or judgment has been entered. *See, e.g., Milbert v. Bison Laboratories, Inc.*, 260 F.2d 431 (3rd Cir.1958); *E.I. DuPont De Nemours & Co.*

*v. Mallinckrodt, Inc.*, 654 F.Supp. 890 (S.D. Ohio 1987); *Lorentz v. Westinghouse Electric Corp.*, 472 F.Supp. 954 (W.D.Pa.1979).

The Court believes that its proposed order—insofar as it relates to the difficult duty to defend issues as well as the proper allocation of defense costs—reflects controlling questions of law and that there is a substantial difference of opinion concerning that order. Indeed the analysis set forth in the Court's previous opinions—if nothing else—evidences the truth of the latter assertion. Further, the Court believes that an immediate appeal would materially advance the ultimate termination of the litigation here. Indeed, if the Court is reversed in whole or in part, a remand will be necessary and, in any event, the pending duty to indemnify issues will also be "materially advanced" by an immediate appellate decision.

Accordingly, I will grant defendant St. Paul and defendant Northbrook's requests for certification. Specifically, the Court certifies the following three issues for interlocutory appeal:

1. Whether defendants Canadian, Northbrook, and St. Paul as well as plaintiff USF & G all have a duty to defend Thomas Solvent in the underlying state court actions (*"Kelley," "Adkins,"* and *"Allen"* actions) as well as in the two CERCLA actions filed in this Court (*USA v. Thomas Solvent, et al.* and *Kelley, et al. v. Thomas Solvent, et al.*) based on the issuance of the general liability policies set forth and discussed in this Court's opinions of January 8, 1988 and March 16, 1988; and

2. Whether plaintiff USF & G and defendant Hartford as automobile insurers have a duty to defend the *"Kelley," "Adkins,"* and *"Allen"* actions as well as the *Kelley, et al. v. Thomas Solvent, et al.* CERCLA action and whether plaintiff USF & G and defendant Hartford do *not* have a duty to defend the *United States v. Thomas Solvent, et al.* CERCLA action based upon the automobile policies discussed in the above-mentioned opinions; and

3. Whether the defense costs incurred by USF & G in the *"Kelley," "Adkins,"* and *"Allen"* and CERCLA actions from February 6, 1984 until the present as well as all future defense costs incurred in these same actions should be shared among USF & G, Canadian, Northbrook, St. Paul, and Hartford in the following manner: USF & G, two-sixths of the defense costs; Canadian, one-sixth of the defense costs; Northbrook, one-sixth of the defense costs; St. Paul, one-sixth of the defense costs; and Hartford, one-sixth of the defense costs.

For the sake of clarity, the Court will enter an order vacating its order of January 8, 1988. It is clear that defendant Hartford's motion to reconsider and/or clarify has been granted in full. Further, defendant St. Paul and defendant Northbrooks' motions for reconsideration, clarification and certification for appeal have been granted in part and denied in part.

ON MOTION FOR RECLARIFICATION

In its amended order of March 16, 1988, the Court clearly granted Hartford's January 26, 1988 motion for clarification and also ordered that defendant Hartford did not have a duty to defend the *U.S. v. Thomas Solvent* "CERCLA" action.

The last paragraph of the first page of the March 16th amended order indicated that defense costs incurred in all *five* actions at issues would be shared among USF & G, Canadian, Northbrook, St. Paul and Hartford in the following manner: USF & G two-sixths of the defense costs; Canadian, one-sixth of the defense costs; Northbrook, one-sixth of the defense costs; St. Paul, one-sixth of the defense costs; and Hartford, one-sixth of the defense costs. The Court should have indicated that that formula of allocating defense costs is only appropriate for four of the above-mentioned actions. USF & G was apportioned "two" shares because it issued both general liability and automobile policies.

The Court agrees that the above-formula is "mathematically" incorrect as applied to the *U.S. v. Thomas Solvent* CERCLA action and will therefore grant Hartford's

motion. Because the Court found that both Hartford and USF & G as automobile insurers did *not* have a duty to defend the *U.S. v. Thomas Solvent* CERCLA action, it appears that the defense costs for *that* particular action should be apportioned only among the four remaining general liability insurers: USF & G, Canadian, Northbrook and St. Paul. Therefore, each of these insurers will thus bear one-fourth of the defense costs for the *U.S. v. Thomas Solvent* CERCLA action.

The Court notes that this change also requires a change in the wording of the third issue which the Court has certified pursuant to 28 U.S.C. § 1291(b). Although these changes are minor compared to the overall length of the amended order, the Court believes that vacating the amended order of March 16, 1988 and entering a second amended order will make it easier for the parties to understand these changes and for the Sixth Circuit to review the issues presented—provided certification is accepted.